# Illinois Official Reports

## Appellate Court

---

### *People v. Garcia*, 2019 IL App (2d) 161112

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICARDO A. GARCIA, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-16-1112 |
| Filed | March 26, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Boone County, No. 13-CF-276; the Hon. C. Robert Tobin III, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Kerry Goettsch, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Tricia L. Smith, State's Attorney, of Belvidere (Patrick Delfino, David J. Robinson, and Cora Moy, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion.<br>Justices Burke and Spence concurred in the judgment and opinion. |

¶ 1 Following a trial in the circuit court of Boone County, a jury found defendant, Ricardo A. Garcia, guilty of first degree murder in connection with the shooting death of Giovanni Galicia (720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2012)). Defendant was also found guilty of mob action (720 ILCS 5/25-1(a)(1) (West 2012)). He was found not guilty, however, of the attempted murders of Jesus Casas and Fermin Estrada. The court sentenced defendant to 35 years in prison for first degree murder, to be served consecutively to a 2-year sentence for mob action. On appeal, defendant challenges the sufficiency of the evidence. He also argues that certain examples that the prosecutor used in his closing argument to illustrate the concept of accountability constituted plain error. For the reasons that follow, we affirm.

¶ 2                                              I. BACKGROUND

¶ 3 Galicia, Casas, and Estrada were all members of the Sureños 13 street gang. Around midnight on the evening of November 29-30, 2013, they arrived together at Estrada's girlfriend's apartment at 2019 Lake Shore Drive in Belvidere after a trip to a McDonald's restaurant. Galicia was in the driver's seat of his Chevrolet Impala, Casas sat in the front passenger's seat, and Estrada was sitting in the back behind Casas. As they waited near the apartment in the Impala, Casas and Estrada noticed a Lincoln Navigator driving slowly down Lake Shore Drive. Two masked men exited from the backseat of the Navigator and approached the Impala while the Navigator continued to drive slowly. One man proceeded to the driver's side of the Impala, and the other went to the passenger's side. Casas saw the man on the passenger's side tap a revolver on the glass, and Estrada noticed that the man on the driver's side was carrying a black handgun. After a brief exchange of words between the masked men and the occupants of the Impala, the man on the driver's side opened fire, peppering the Impala with bullets. Four of those bullets struck Galicia, and he was killed by a shot to the head. Neither Casas nor Estrada was injured by the gunfire. Casas and Estrada then watched as the two men jumped back into the Navigator and drove away from the scene. Estrada called 911.

¶ 4 Police officers drove around the area in an attempt to locate the Navigator. Sergeant Daniel Reid of the Boone County Sheriff's Office located and began to follow a Navigator, which turned out to be driven by defendant. Defendant led Reid on a high-speed chase through Boone and Winnebago Counties. In the course of that pursuit, defendant ignored traffic signals, jumped a raised median, and at one point accelerated in reverse directly toward Reid's vehicle. By the time defendant came to a stop on Perryville Road in Rockford, near the intersection with Spring Creek Road, his driver's-side wheels were on rims. The four occupants of the Navigator—defendant, Anthony Perez, Ricardo Figueroa, and Cheyanne Patton—then fled on foot.

¶ 5 Reid shot defendant in the knee, and defendant was quickly apprehended by a different officer. The police subsequently apprehended Figueroa, Patton, and eventually Perez. Upon searching the Navigator, the police found a .40-caliber Glock semiautomatic handgun with an extended magazine sitting on the driver's seat. An Illinois State Police firearms examiner determined that the casings that were found at the scene of the shooting at 2019 Lake Shore Drive were fired from the Glock. Police also found two masks in the Navigator and a revolver lying nearby on the street.

¶ 6        Defendant was charged by indictment with first degree murder under three different subsections of the murder statute. He was also charged with mob action, two counts of attempted murder, and several offenses that were nol-prossed prior to trial. At defendant's trial,[1] the State introduced evidence that defendant, Perez, Figueroa, and Patton were all members of the Latin Kings street gang, which had a rivalry with the Sureños 13 street gang. A gang expert, Sergeant David Dammon of the Belvidere Police Department, testified that members of the Sureños 13 street gang lived in or around an area of Belvidere that was known as "Little Mexico." In her testimony, Patton referred to a "Little Village," but defendant acknowledges in his appellant's brief that this was the area known as Little Mexico ("The evidence is undisputed that [defendant] drove Perez to 'Little Village' (a.k.a. 'Little Mexico') and drove Perez away after the shooting."). According to the State's theory at trial, Figueroa was the person who approached the passenger's side of Galicia's Impala, Perez was the shooter on the driver's side, and defendant was criminally responsible for the actions of Figueroa and Perez under principles of accountability.

¶ 7        On appeal, defendant does not dispute that the State proved that Perez and Figueroa committed the offenses of murder and mob action. Instead, defendant argues that the State did not prove that he was legally accountable for the actions of Perez and Figueroa. We therefore focus at this point on certain evidence that sheds additional light on the alleged common criminal design among defendant, Perez, and Figueroa.

¶ 8        Patton, who testified for the State upon a grant of use immunity and after being threatened with contempt, testified as follows. On the evening of November 29-30, 2013, defendant, who was her boyfriend at the time, drove her in his Lincoln Navigator to a house party on Strawberry Lane in Belvidere. She had been to that house before, and, at some point in the past, somebody had fired gunshots at her outside of that house. There were a lot of people at the house on the night of November 29-30, including Figueroa, whom she knew as "Jock," and a person whom she knew as "Shadow." (Shortly after the shooting, Patton identified Perez as "Shadow" from a police lineup, and an officer also testified at trial that Perez was known on the streets as "Shadow.")

¶ 9        Patton explained that she noticed at the party that Shadow was taking pictures with a black gun that had an extended clip. At some point that night, Patton decided to leave the house with defendant in his Navigator to go get cigarettes. Defendant was in the driver's seat, and she was in the passenger's seat. As they were pulling out, a man whom she knew as "Kuete" or "Daniel" asked them to get beer. Jock and Shadow then got in the back of defendant's Navigator and told him to "take them to Little Village."

¶ 10        Patton testified that she did not know why Jock and Shadow wanted defendant to drive them to Little Village. Asked by the prosecutor what, if any, statements "they" made (presumably, Jock and Shadow), Patton responded: "He wanted to go get at somebody. I don't know." She added, "I don't know—we didn't know what their intentions were though." According to Patton, defendant took Jock and Shadow where they asked him to take them, which was just a few minutes away from Strawberry Lane. At some point the Navigator came to a stop. Jock and Shadow then got out and told defendant "[t]o go around the block, like, to drive." Defendant then started to go, and Patton heard multiple gunshots "real quick."

---

[1]Defendant, Perez, and Figueroa were each tried separately.

¶ 11 Patton explained that, when Jock and Shadow got back in the Navigator, Shadow said that he "shot that n*** in the face." Shadow had a gun in his hand—the same gun that Patton had seen earlier at the house party. Patton claimed that Jock and Shadow told defendant to drive and that one of them said to go to Rockford. After defendant drove out of Belvidere, a police car came up behind them. Jock and Shadow kept telling defendant to drive. According to Patton, defendant was driving normally when the police had their lights and sirens on. When the Navigator came to a stop, all of the occupants got out and ran. Patton had outstanding warrants at the time and was apprehended close by.

¶ 12 On cross-examination, Patton testified that she did not know what time she arrived at the house party that night, but she said that she was with defendant for most of the time she was there. After Shadow took pictures with the gun with the extended clip, she saw Shadow again at the house over the next hours, and he did not have the gun. She and defendant were at the party for a few hours before they decided to get cigarettes. Both of them were in the Navigator pulling out when Daniel waved them down and told them that he wanted them to pick up beer from a Mobil station. As Daniel was talking about getting beer, Jock and Shadow got in the Navigator. Patton had not heard any discussions between Jock and Shadow before they got in the Navigator. She did not know what Jock's and Shadow's intentions were when they said they wanted to go to Little Village.

¶ 13 Patton continued on cross-examination to testify that it took a few minutes to go from the house on Strawberry Lane to Little Village. She figured that they would go to Little Village first, because it was right by the Mobil where she was going anyway. She did not hear any discussions about guns during that time, nor did she see any guns. When they got to Little Village, "somebody" told defendant to stop the Navigator. Defendant did so, and Jock and Shadow got out and started to walk away. When defendant stopped, Patton did not see anybody outside on the streets. Jock and Shadow said something about meeting them around the back, and defendant started to drive away. Defendant drove away at a normal speed, and Patton heard gunshots very soon thereafter. Then the Navigator stopped, and Jock and Shadow got back in. Both Patton and defendant were looking around to see what was going on. Shadow was holding the same gun that she had seen before, but she did not see the gun's clip. Jock gave defendant driving directions, and defendant was "a little freaked out." Prior to getting into the Navigator, Patton did not hear any discussions about shooting or killing anybody.

¶ 14 On redirect examination, Patton testified that, when the four of them set off for Little Village that night, she knew that Jock and Shadow wanted "[t]o get at somebody." However, she did not think that Jock and Shadow were going to kill somebody. She would not have stayed in the car if she "thought it was going to be something serious."

¶ 15 On recross-examination, Patton agreed with defense counsel that "to get at somebody" could "also mean you're going to get at them by going and talking to them." Patton reiterated that she did not think that Jock and Shadow intended to kill somebody. Defense counsel asked: "To get at somebody could mean you got to [*sic*] talk to them about something other—just something. Getting at them is talking to them; is that fair?" Patton responded in the affirmative.

¶ 16 Upon further redirect examination, Patton acknowledged having told detectives on the night of the shooting: "yeah, like get at them, and they said one of these b*** if they are outside." She had also told police: "pretty much a Mexican," or words to that effect.

¶ 17    Defendant did not present any evidence. The jury found defendant guilty of murder and mob action but not guilty of attempted murder. He was sentenced to a total of 37 years in prison. He appeals.

¶ 18                                    II. ANALYSIS

¶ 19    Defendant challenges the sufficiency of the evidence. He also argues that certain examples that the prosecutor used during closing argument constituted plain error.

¶ 20                          A. Sufficiency of the Evidence

¶ 21    Defendant maintains that the State failed to prove that he was legally accountable for the actions of Perez and Figueroa, because Patton "provided the only evidence on the issue of accountability and her testimony that Perez and Figueroa wanted to 'get at somebody' was not sufficient to prove that [defendant] had agreed to facilitate any criminal behavior." In that respect, defendant insists that the words "get at" could be interpreted in any number of innocent ways, such that it is impossible to say what they meant here. Defendant also asserts that there was no testimony showing that he knew that Perez was armed or that Perez intended to commit a crime. Furthermore, according to defendant, Patton's testimony even "explicitly refuted the theory of accountability," insofar as she testified that she did not know Perez's intentions or that Perez was armed and she said that she would not have stayed in the Navigator if she thought that Perez contemplated something serious. Defendant also emphasizes that the evidence showed that he was in the process of driving away before the shooting occurred. Although defendant acknowledges that he facilitated Perez's exit from the scene of the crime by driving the Navigator to Rockford, he insists that "simply running from the crime in the same direction as the perpetrator does not establish accountability." Defendant argues that he was not guilty of murder or mob action and that he was shown to be at most an accessory after the fact.

¶ 22    The State responds that the evidence was sufficient to sustain defendant's convictions of murder and mob action. The State maintains that, when Perez and Figueroa made it known to defendant and Patton that they wanted to "get at somebody," a jury could have found that this "necessitated some type of force or violence, or meant they wanted to shoot rival gang members." According to the State, defendant agreed to "get at somebody" by driving Perez and Figueroa to Little Village and dropping them off there. By doing so, defendant aided or abetted them prior to or during the commission of the offenses. The State contends that the evidence supports defendant's convictions under a common-design theory.

¶ 23    In his reply brief, defendant suggests that there was no evidence that he actually heard Perez and Figueroa say that they wanted to "get at" someone.

¶ 24    It is not the appellate court's function to retry the defendant. *People v. Jaimes*, 2014 IL App (2d) 121368, ¶ 25. Instead, when considering a challenge to the sufficiency of the evidence, "[t]he relevant question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original and internal quotation marks omitted.) *Jaimes*, 2014 IL App (2d) 121368, ¶ 25 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)).

¶ 25    Section 9-1(a) of the Criminal Code of 2012 (Code) provides:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a) (West 2012).

Defendant was convicted under all three subsections of this statute, but he was sentenced only on the count alleging a violation of subsection (a)(1). Defendant was also convicted of mob action, which requires "the knowing or reckless use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law." 720 ILCS 5/25-1(a)(1) (West 2012).

¶ 26    The State relied on principles of accountability to hold defendant responsible for the actions of Perez and Figueroa. Section 5-2(c) of the Code provides that a person is legally accountable for another's conduct when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2012). The State may prove that a defendant possessed the requisite intent to promote or facilitate a crime by "present[ing] evidence that either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *People v. Fernandez*, 2014 IL 115527, ¶ 13.

¶ 27    Pursuant to the common-design rule, "if 'two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts.' " *Fernandez*, 2014 IL 115527, ¶ 13 (quoting *In re W.C.*, 167 Ill. 2d 307, 337 (1995)); see also 720 ILCS 5/5-2(c) (West 2012). Where a defendant voluntarily attaches himself to a group that is bent on illegal acts and he has knowledge of the group's design, this supports an inference that the defendant shared the common purpose and will sustain the defendant's conviction for an offense committed by another member of the group. *Fernandez*, 2014 IL 115527, ¶ 13. In evaluating whether a defendant is legally accountable for the actions of another, the trier of fact may consider factors such as whether the defendant was present during the perpetration of the offense, whether he fled from the scene, whether he maintained a close affiliation with his companions after the commission of the crime, and whether he failed to report the crime. *Fernandez*, 2014 IL 115527, ¶ 17. Active participation in the offense is not required. *People v. Taylor*, 164 Ill. 2d 131, 140 (1995). Nor is it necessary for the State to prove "[w]ords of agreement" to establish a common purpose to commit a crime. *Taylor*, 164 Ill. 2d at 141. To the contrary, "[t]he common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct." *Taylor*, 164 Ill. 2d at 141. Nevertheless, the fact that a defendant was present at the scene of a crime and knew that a crime was being committed, without more, does not establish accountability. *Taylor*, 164 Ill. 2d at 140.

¶ 28    The evidence was sufficient to support defendant's convictions under a common-design theory. On appeal, defendant does not dispute that Perez and Figueroa participated in Galicia's murder and also committed the offense of mob action. The jury was indeed

- 6 -

presented with sufficient evidence to conclude that Perez fired numerous shots into the driver's side of Galicia's Impala while Figueroa stood on the other side of the car holding a revolver. See *Jaimes*, 2014 IL App (2d) 121368, ¶ 38 ("[T]o obtain a conviction based on accountability, the State must prove that the principal actually committed the offense.").

¶ 29    Defendant's contention that Patton provided the only evidence of accountability is simply incorrect. There was substantial circumstantial evidence elicited from witnesses other than Patton justifying a conclusion that defendant, Perez, and Figueroa had a common criminal design in the early morning hours of November 30, 2013. Sergeant Dammon testified that defendant, Perez, Figueroa, and Patton belonged to a gang that was a rival of the gang to which Galicia, Casas, and Estrada belonged. The evidence showed that defendant drove Perez and Figueroa to rival gang territory on the night of the shooting. Casas and Estrada described how they saw defendant's Navigator drive slowly down Lake Shore Drive before the shooting and then leave the area once the two perpetrators jumped back into the vehicle. Even though defendant did not keep his Navigator stationary after Perez and Figueroa exited the vehicle, he certainly remained in the immediate vicinity long enough for Perez and Figueroa to approach Galicia's Impala, engage in some conversation with the occupants of that car, fire approximately a dozen shots at the car, and then run back to the Navigator. It is clear that defendant did not simply drive away from the scene after dropping off Perez and Figueroa.

¶ 30    Additionally, the testimony of numerous police officers established that defendant fled with Perez and Figueroa after the shooting. Not only did defendant attempt to evade police by driving recklessly through two counties, he eventually jumped out of the Navigator with the other occupants of the vehicle and ran away. According to Sergeant Edward Krieger of the Boone County Sheriff's Office, once defendant was apprehended and the police were trying to locate and identify the female who had run from the Navigator, defendant either denied knowing her name or declined to reveal her name. The police also found the murder weapon on the driver's seat of the Navigator, and there were masks in the back of the vehicle. These all were circumstances that the jury was entitled to consider in assessing defendant's guilt by accountability. See *Fernandez*, 2014 IL 115527, ¶ 17 (the trier of fact may consider a defendant's presence during the perpetration of the offense, his flight from the scene, his maintenance of a close affiliation with his companions after the commission of the crime, and his failure to report the crime).

¶ 31    Patton's testimony provided additional insight regarding defendant's intentional participation in a common criminal design. She acknowledged having seen Perez in possession of a gun with an extended clip earlier that evening. Defendant suggests that there was no evidence that *he* knew that Perez was armed. But Patton testified that she was with defendant for most of the time while they were at the party on Strawberry Lane. The jury thus could have reasonably inferred that defendant was present when Perez was showing off his weapon hours before the shooting.

¶ 32    Patton also explained that Perez and Figueroa asked defendant to drive them to Little Village to "go get at somebody." She acknowledged having told police something about getting at "one of these b*** if they are outside," "pretty much a Mexican." Defendant's contention that he might not have heard these remarks makes little sense, as Perez and/or Figueroa purportedly made them in defendant's presence. Defendant indeed drove Perez and

Figueroa to Little Village at their request, which further indicates that defendant heard their comments.

¶ 33    Moreover, although Patton claimed that she did not know exactly what Perez and Figueroa intended to do in Little Village—*i.e.*, she did not know that they were going to do "something serious"—the jury was entitled to determine which portions of her testimony were credible and which were not. See *People v. Rouse*, 2014 IL App (1st) 121462, ¶ 46 ("A trier of fact is free to accept or reject 'as much or as little' of a witness's testimony as it likes." (quoting *People v. Logan*, 352 Ill. App. 3d 73, 81 (2004))). The jury could have reasonably determined that Patton was minimizing her own involvement in Perez's and Figueroa's illegal activities. The jury could have also believed that Patton wanted to protect defendant, who was her ex-boyfriend. For example, she testified that defendant drove normally when the police had their lights and sirens on, whereas other evidence clearly showed that defendant led police on an erratic high-speed chase.

¶ 34    Defendant suggests that there is some ambiguity as to what it means to "go get at somebody." "To 'get' someone means to '[p]unish, injure, or kill' someone, 'especially as retribution.' " *People v. Dye*, 2015 IL App (4th) 130799, ¶ 11 (quoting The New Oxford American Dictionary 712 (2001)). To determine whether the statement conveyed an intent to commit violence, it is important to consider the context in which the statement was made. See *Dye*, 2015 IL App (4th) 130799, ¶ 11 (recognizing that, depending on the context, " '[g]etting' someone *can* mean injuring or killing that person" but it could also mean "punishing that person in a nonviolent way" (emphasis in original)). Where one gang member gave another gang member, who had been taking pictures with a gun earlier in the evening, a ride to rival gang territory for the stated purpose of "get[ting] at somebody," the jury could have reasonably found that this was an agreement or plan to engage in acts of violence or even murder. Importantly, even if defendant did not specifically contemplate murder, once he agreed to drive Perez and Figueroa to Little Village to facilitate their violent criminal activities, he became liable for their acts in furtherance of that common criminal design. See *Fernandez*, 2014 IL 115527, ¶ 13; see also *People v. Terry*, 99 Ill. 2d 508, 515 (1984) (where a group of men conspired to commit battery and the victim ended up being stabbed to death, all members of the group were accountable for the murder under the common-design rule). Although Patton agreed with defense counsel that "get[ting] at somebody" could mean simply talking to that person, the jury was not required to conclude that defendant thought that he was taking Perez and Figueroa to rival gang territory at midnight to promote or facilitate conversation.

¶ 35    Defendant relies on *People v. Taylor*, 186 Ill. 2d 439 (1999), and *People v. Johnson*, 2014 IL App (1st) 122459-B, cases where the reviewing courts found that the evidence failed to support convictions based on accountability. Those cases are distinguishable. In *Taylor*, it was "uncontroverted" that the defendant did not know of his passenger's criminal intentions before the passenger responded to an unplanned traffic incident by firing his gun. *Taylor*, 186 Ill. 2d at 447. Our supreme court has since clarified that *Taylor* was a shared-intent case and was decided under a rule that does not apply when the State pursues a common-design theory. *Fernandez*, 2014 IL 115527, ¶ 21. The court in *Fernandez* also stressed that *Taylor* involved circumstances where the defendant "had no idea that *any crime* was going to be committed, let alone the one that actually was committed." (Emphasis in original.) *Fernandez*, 2014 IL 115527, ¶ 21. *Johnson* involved circumstances that were similar to

*Taylor*. Specifically, the court in *Johnson* found that there was "*no* evidence that [the] defendant knew the shooter was armed and planned to murder the victim, or that [the] defendant intentionally and knowingly acted to facilitate the murder." (Emphasis in original.) *Johnson*, 2014 IL App (1st) 122459-B, ¶ 156. Unlike in *Taylor* and *Johnson*, as explained above, the totality of the evidence here supported a conclusion that, before or during the commission of the offenses of murder and mob action by Perez and Figueroa, defendant intentionally promoted or facilitated those offenses by aiding and abetting his fellow gang members. Accordingly, the State proved defendant guilty of those offenses beyond a reasonable doubt.

¶ 36                                B. Closing Argument

¶ 37     During closing argument, the prosecutor attempted to illustrate the concept of accountability with the following two examples:

"Now, we recognize this concept every day and we probably don't even think about it during lawful activities. For example, if you go to JC Penney's and you want to buy blue jeans and you go into the store and there's a sales clerk walking by and you stop her and say, 'Excuse me. Where are your blue jeans?' And she says, 'Oh, they're on the back wall.' So you go to the back wall, you pick out your Levis, and you go to the cash register and another woman rings you out. Now, the question is who sold you the jeans. Was it JC Penney, was it Levi Strauss, was it the salesperson who pointed you to the back wall, or the salesperson who took your money? Well, in truth they all are responsible for selling you the jeans because they all facilitated the sale.

We also see this that we don't need to see an expressed agreement to know that there was a plan. Again, if you're walking along the sidewalk next to a park and you watch a car pull up, there's a parent in the front seat and two children get out and run and start playing [in] the park, you know that there was a common plan to go to the park between those three people. You know that it existed before they arrived at the park. They decided sometime to go to the park. They got in the car and drove to the park. That plan existed before they got to that park, and you have no evidence of an expressed agreement to go to the park, but you have no problem with the concept that the parents are responsible for the children being at the park because they facilitated that transaction. You don't need an expressed agreement. You can tell by the circumstances that there was an agreement to go to the park."

Defense counsel did not object to these remarks, and defendant did not include the issue in his posttrial motion.

¶ 38     Defendant now argues that the prosecutor misstated the law of accountability in multiple ways. With respect to the JCPenney example, defendant insists that the prosecutor was incorrect to assert that this scenario was an example of accountability. Specifically, he maintains that accountability requires "some action to facilitate a criminal endeavor, not just a causal relationship between the parties and the result." Defendant also proposes that "[i]t was wrong for the State to suggest innocent behavior, such as manufacturing or selling jeans, could be the basis for a conviction under a theory of accountability." Furthermore, according to defendant, if everybody in the chain of causation were responsible for a perpetrator's

actions, "then whoever sold Anthony Perez the jeans he wore on the night of the shooting would be accountable for his actions."

¶ 39    Defendant finds additional error with the prosecutor's park example. Defendant submits that, although the parent and children in this example indeed shared a common design, they did not share a common *criminal* design and therefore would not be legally accountable for one another's acts. In other words, the prosecutor erroneously suggested to the jury that merely driving a person to his or her destination is evidence of accountability. Defendant insists that there must instead be "evidence of an agreement to commit a criminal act for accountability to apply, not simply a plan to travel to a particular location." Defendant also maintains that it was error for the prosecutor to say that there did not need to be an "expressed agreement." According to defendant, "absent some 'expression' of an 'agreement' to commit a crime, the State cannot prove accountability[,] because there would be no way to prove an agreement that was never expressed in some fashion."

¶ 40    Defendant acknowledges that he did not preserve these arguments, but he invokes both prongs of the plain-error doctrine.

¶ 41    The State responds that the prosecutor did not misstate the law. The State proposes that the prosecutor merely illustrated to the jury, in common parlance, that "a common design may be inferred by the surrounding circumstances" and that "words of agreement are not needed [to] establish a common design." The State argues that the remarks at issue also showed how the plan could not be carried out without the participation of all members. The State acknowledges that neither the JCPenney example nor the park example was of criminal conduct. However, the State insists that these remarks do not warrant reversal, as the judge instructed the jury that accountability requires some action to "facilitate the commission of the offense." The judge also told the jury that "[n]either opening statements nor closing arguments are evidence and any statement or argument made by the attorneys which is not based on the evidence should be disregarded." The State contends that, even if the remarks were erroneous, they did not amount to plain error under either prong.

¶ 42    To preserve an issue for appellate review, a defendant must object to the purported error at trial and raise the issue in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. Pursuant to the plain-error doctrine, however, a court of review may excuse a procedural default in two circumstances:

> "(1) when 'a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error,' or (2) when 'a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Sebby*, 2017 IL 119445, ¶ 48 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

Irrespective of which prong of the plain-error doctrine the defendant invokes, the first step in the analysis is to determine whether a clear or obvious error occurred at trial. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 43    We agree with defendant that the prosecutor's examples, in and of themselves, failed to provide complete and accurate representations of the law of accountability. Neither scenario mentioned any sort of criminal activity. Of course, one cannot be held criminally accountable for another's actions in the absence of a crime. The examples also failed to illustrate that a

- 10 -

defendant is not accountable for another's conduct unless the defendant acts with the *intention* of promoting or facilitating the commission of an offense. 720 ILCS 5/5-2(c) (West 2012). The JCPenney example in particular was problematic insofar as the prosecutor implied that everybody in the causal chain was "responsible" for selling the blue jeans, even though there was no mention of each individual's intent to facilitate the sale.

¶ 44    Moreover, the park example did a poor job of illustrating the supposed common plan among the occupants of the vehicle. The prosecutor asserted that the children, who were of unspecified ages, must have planned in advance to go to the park simply because their parent ended up taking them there. That is not necessarily the case. What if the parent did not tell the children in advance that they were going to the park? What if the parent did not form any plan to take the children to the park until he or she happened to pass the park on the way to a different destination? Additionally, as defendant correctly notes, driving a person to a destination does not in itself make the driver legally accountable for the passenger's acts. With that said, defendant's concerns about the prosecutor's use of the phrase "expressed agreement" in the park example are a bit overstated. The prosecutor clearly used this phrase as part of his attempt to illustrate, albeit through a questionable example, that the State does not need to prove express words of agreement between codefendants and that the common design may instead be inferred from the surrounding circumstances. We note that the prosecutor made this point again in the rebuttal closing argument ("[R]emember, we don't need to prove words—expressed words."). That is a correct proposition of law. See *Taylor*, 164 Ill. 2d at 141.

¶ 45    Although the State's examples were inartful, we hold that any error that occurred does not require reversal pursuant to either prong of the plain-error doctrine. See *People v. Euell*, 2012 IL App (2d) 101130, ¶ 19 (although a prosecutor made certain improper remarks, the defendant failed to demonstrate that the error was reversible under the plain-error doctrine). "Where the defendant claims first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. To determine whether the evidence was closely balanced, we "evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. This "inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 46    The evidence on the issue of defendant's accountability was not closely balanced. For all of the reasons explained in the reasonable-doubt section of this opinion, the evidence overwhelmingly supported a conclusion that, before or during the commission of the offenses of murder and mob action and with the intent to promote or facilitate the commission of those offenses, defendant aided and abetted Perez and Figueroa by agreeing to be their "wheelman." This is not a case, for example, where the outcome depended on a credibility contest among witnesses who provided materially different but plausible descriptions of the relevant events. See *People v. Montgomery*, 2018 IL App (2d) 160541, ¶ 32 (where the State provided ample and unrefuted evidence of a defendant's guilt, the evidence was not closely balanced merely because the defendant identified certain weaknesses in the State's case).

¶ 47    Under the second prong of the plain-error doctrine, we must determine "whether the defendant has shown that the error was so serious it affected the fairness of the trial and

- 11 -

challenged the integrity of the judicial process." *Sebby*, 2017 IL 119445, ¶ 50. "[O]nly an extraordinarily serious error will render a proceeding 'unfair' " for purposes of the second prong. *People v. Johnson*, 2017 IL App (2d) 141241, ¶ 51. The shortcomings in the prosecutor's examples were not so serious as to meet this standard. For one thing, the remarks were isolated, constituting merely 2 paragraphs of the State's 60-plus-page closing argument, including the rebuttal. It is clear from the entirety of the State's closing argument that its theory was that defendant had a common criminal design with Perez and Figueroa. That was a proper legal theory that was supported by the evidence. Furthermore, defense counsel in his closing argument specifically informed the jury of some of the problems with the prosecutor's park example:

> "Now, when we talk about—when he talks about his analogies, he talks about, well, when you go to a park and two kids get out of the car and they run to the park, you know there was an agreement to go to the park. Okay. When those kids start getting in a fight with somebody else there, the parents did not agree for that fight. The parents did not intend for that fight. The parents did not plan for that fight. They are not accountable for that fight. Merely getting the kids to the park or merely getting these people to this area is not accountability. It is not guilty and it is not beyond a reasonable doubt."

We also note that defendant does not dispute that the jury instructions properly articulated the law of accountability and were delivered to the jury orally and in writing by the judge. Considering that (1) the two examples at issue constituted a small portion of the State's closing argument, which otherwise reflected a proper legal theory, (2) defense counsel took the opportunity to explain to the jury the flaws in one of those examples, and (3) the judge properly instructed the jury, there is no threat that the jury was under any misapprehensions about the applicable law. See *People v. Glasper*, 234 Ill. 2d 173, 215 (2009) (where the trial court properly instructed the jury, our supreme court declined to conclude that a "prosecutor's argument about a hypothetical scenario was so prejudicial that the jurors ignored the instructions and based their decision on a make-believe situation"). Contrary to what defendant suggests, this was not a situation where cumulative errors "created a pervasive pattern of unfair prejudice to [his] case." *People v. Blue*, 189 Ill. 2d 99, 139 (2000). Nor was this a situation where the jury was never correctly informed of the essential elements of the offenses. See *People v. Ogunsola*, 87 Ill. 2d 216, 221-22 (1981). For these reasons, defendant has not demonstrated second-prong plain error.

¶ 48    Defendant relies on *People v. Carbajal*, 2013 IL App (2d) 111018, and *People v. Buckley*, 282 Ill. App. 3d 81 (1996). In *Carbajal*, the prosecutor committed multiple errors in closing argument, including misstating the law pertaining to the State's shared-intent theory of accountability. *Carbajal*, 2013 IL App (2d) 111018, ¶¶ 31-32. In *Buckley*, the prosecutor equated recklessness with carelessness during closing argument, thereby misstating the required mental state of the charged crime. *Buckley*, 282 Ill. App. 3d at 89. In both cases, the courts found plain error based on the closeness of the evidence. *Carbajal*, 2013 IL App (2d) 111018, ¶ 46; *Buckley*, 282 Ill. App. 3d at 88-89. That distinguishes those cases from the matter at bar, where the evidence was not closely balanced. Although the State's examples here, in and of themselves, failed to accurately and completely illustrate the law of accountability, defendant has not demonstrated plain error under either prong. See *People v. Modrowski*, 296 Ill. App. 3d 735, 743 (1998) (where a prosecutor misstated the law of

accountability in rebuttal closing argument but the evidence was not close and the circumstances did not support a conclusion that the defendant was prejudiced by the error, the trial court did not commit plain error by refusing to give curative instructions or declare a mistrial once the jury began deliberating).

¶ 49  We note that in *Carbajal* we recognized that defendants face "a substantial burden in achieving reversal of [their] conviction[s] based upon improper remarks during closing argument" and that this is especially true where the issue was not preserved and the court must review the matter for plain error. *Carbajal*, 2013 IL App (2d) 111018, ¶ 39. If defendant had preserved his arguments for review, we could find reversible error only if the prosecutor's improper remarks were "so substantial that a reasonable jury could have reached a different verdict" in the absence of the remarks, such that the remarks were "a material factor in defendant's conviction." *People v. Meeks*, 382 Ill. App. 3d 81, 84 (2008). To assess the prejudicial impact of improper remarks, courts may consider whether, as here, the judge gave the jury proper oral and written instructions. See *Meeks*, 382 Ill. App. 3d at 86; see also *Terry*, 99 Ill. 2d at 517 (alleged misstatements of the law of accountability during closing arguments were remedied by proper instructions). For all of the reasons explained above, even if defendant had preserved his arguments, we would not conclude that the prosecutor's examples were a material factor in defendant's convictions. If we would not have reversed based on a preserved error, defendant certainly has not met his burden to demonstrate plain error. See *Euell*, 2012 IL App (2d) 101130, ¶ 22 ("If we do not automatically reverse in light of a *preserved* misstatement of the burden of proof, certainly we may not automatically reverse in light of a *forfeited* one." (Emphases in original.)).

¶ 50  III. CONCLUSION

¶ 51  For the reasons stated, we affirm the judgment of the circuit court of Boone County. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 52  Affirmed.