2022 IL App (2d) 210002-U
No. 2-21-0002
Order filed May 4, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-276 |
| RICARDO A. GARCIA, | ) ) | Honorable C. Robert Tobin III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Bridges and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1     *Held*: The Appellate Court affirmed the summary dismissal of the defendant's postconviction petition because defendant failed to meet the standard to proceed on a claim of actual innocence.

¶ 2     Following a trial in the circuit court of Boone County, a jury found defendant, Ricardo A. Garcia, guilty of first-degree murder in connection with the shooting death of Giovanni Galicia (720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2012)). Defendant was also found guilty of mob action (720 ILCS 5/25-1(a)(1) (West 2012)). He was found not guilty, however, of the attempted murders of Jesus Casas and Fermin Estrada. The court sentenced defendant to 35 years in prison for first-

degree murder, to be served consecutively to a 2-year sentence for mob action. We affirmed defendant's convictions on direct appeal. *People v. Garcia*, 2019 IL App (2d) 161112. Defendant later filed a postconviction petition alleging actual innocence. The trial court summarily dismissed that petition. Defendant appeals from that order, and we affirm.

¶ 3                                        I. BACKGROUND

¶ 4                                        A. The Trial

¶ 5      To contextualize defendant's postconviction claim, we recount the trial evidence by reiterating most of the statement of facts from our decision in defendant's direct appeal.

¶ 6      Galicia, Casas, and Estrada were all members of the Sureños 13 street gang. Around midnight on the evening/early morning of November 29-30, 2013, they arrived together at Estrada's girlfriend's apartment at 2019 Lake Shore Drive in Belvidere after a trip to a McDonald's restaurant. Galicia was in the driver's seat of his Chevrolet Impala, Casas sat in the front passenger's seat, and Estrada was sitting in the back behind Casas. As they waited near the apartment in the Impala, Casas and Estrada noticed a Lincoln Navigator driving slowly down Lake Shore Drive. Two masked men exited from the backseat of the Navigator and approached the Impala while the Navigator continued to drive slowly. One man proceeded to the driver's side of the Impala, and the other went to the passenger's side. Casas saw the man on the passenger's side tap a revolver on the glass, and Estrada noticed that the man on the driver's side was carrying a black handgun. After a brief exchange of words between the masked men and the occupants of the Impala, the man on the driver's side opened fire, peppering the Impala with bullets. Four of those bullets struck Galicia, and he was killed by a shot to the head. Neither Casas nor Estrada was injured by the gunfire. Casas and Estrada then watched as the two men jumped back into the Navigator and drove away from the scene. Estrada called 911.

¶ 7    Police officers drove around the area in an attempt to locate the Navigator. Sergeant Daniel Reid of the Boone County Sheriff's Office located and began to follow a Navigator, which turned out to be driven by defendant. Defendant led Reid on a high-speed chase through Boone and Winnebago Counties. In the course of that pursuit, defendant ignored traffic signals, jumped a raised median, and at one point accelerated in reverse directly toward Reid's vehicle. By the time defendant came to a stop on Perryville Road in Rockford, near the intersection with Spring Creek Road, his driver's-side wheels were on rims. The four occupants of the Navigator—defendant, Anthony Perez, Ricardo Figueroa, and Cheyanne Patton—then fled on foot.

¶ 8    Reid shot defendant in the knee, and defendant was quickly apprehended by a different officer. The police subsequently apprehended Figueroa, Patton, and eventually Perez. Upon searching the Navigator, the police found a .40-caliber Glock semiautomatic handgun with an extended magazine sitting on the driver's seat. An Illinois State Police firearms examiner determined that the casings that were found at the scene of the shooting at 2019 Lake Shore Drive were fired from the Glock. Police also found two masks in the Navigator and a revolver lying nearby on the street. One was a ski mask, and the other was a mask that was reminiscent of the 1996 horror film *Scream*.

¶ 9    Defendant was charged by indictment with first-degree murder under three different subsections of the murder statute. He was also charged with mob action, two counts of attempted murder, and several offenses that were nol-prossed prior to trial. At defendant's trial,[1] the State introduced evidence that defendant, Perez, Figueroa, and Patton were all members of the Latin Kings street gang, which had a rivalry with the Sureños 13 street gang. A gang expert, Sergeant David Dammon of the Belvidere Police Department, testified that members of the Sureños 13

_____

[1] Defendant, Perez, and Figueroa were each tried separately.

street gang lived in or around an area of Belvidere that was known as "Little Mexico" (also referred to at trial as "Little Village"). According to the State's theory at trial, Figueroa was the person who approached the passenger's side of Galicia's Impala, Perez was the shooter on the driver's side, and defendant was criminally responsible for the actions of Figueroa and Perez under principles of accountability.

¶ 10 Patton, who testified for the State upon a grant of use immunity and after being advised that she could be subject to contempt, testified as follows. Sometime on November 29, 2013, defendant, who was her boyfriend at the time, drove her in his Lincoln Navigator to a house party on Strawberry Lane in Belvidere. She had been to that house before, and, at some point in the past, somebody had fired gunshots at her outside of that house. There were a lot of people at the house on November 29-30, including Figueroa, whom she knew as "Jock," and a person whom she knew as "Shadow." (Shortly after the shooting, Patton identified Perez as "Shadow" from a police lineup, and an officer also testified at trial that Perez was known on the streets as "Shadow.")

¶ 11 Patton explained that she noticed at the party that Shadow was taking pictures with a black gun that had an extended clip. At some point that night, Patton decided to leave the house with defendant in his Navigator to go get cigarettes. Defendant was in the driver's seat, and she was in the passenger's seat. As they were pulling out, a man whom she knew as "Kuete" or "Daniel" asked them to get beer. Jock and Shadow then got in the back of defendant's Navigator and told him to "take them to Little Village."

¶ 12 Patton testified that she did not know why Jock and Shadow wanted defendant to drive them to Little Village. Asked by the prosecutor what, if any, statements "they" made (presumably, Jock and Shadow), Patton responded: "He wanted to go get at somebody. I don't know." She added, "I don't know—we didn't know what their intentions were though." According to Patton,

defendant took Jock and Shadow where they asked him to take them, which was just a few minutes away from Strawberry Lane. At some point the Navigator came to a stop. Jock and Shadow then got out and told defendant "[t]o go around the block, like, to drive." Defendant then started to go, and Patton heard multiple gunshots "real quick."

¶ 13    Patton explained that, when Jock and Shadow got back in the Navigator, Shadow said that he "shot that n*** in the face." Shadow had a gun in his hand—the same gun that Patton had seen earlier at the house party. Patton claimed that Jock and Shadow told defendant to drive and that one of them said to go to Rockford. After defendant drove out of Belvidere, a police car came up behind them. Jock and Shadow kept telling defendant to drive. According to Patton, defendant was driving normally when the police had their lights and sirens on. When the Navigator came to a stop, all of the occupants got out and ran. Patton had outstanding warrants at the time and was apprehended close by.

¶ 14    On cross-examination, Patton testified that she did not know what time she arrived at the house party that night, but she said that she was with defendant for most of the time she was there. After Shadow took pictures with the gun with the extended clip, she saw Shadow again at the house over the next hours, and he did not have the gun. She and defendant were at the party for a few hours before they decided to get cigarettes. Both of them were in the Navigator pulling out when Daniel waved them down and told them that he wanted them to pick up beer from a Mobil station. As Daniel was talking about getting beer, Jock and Shadow got in the Navigator. Patton had not heard any discussions between Jock and Shadow before they got in the Navigator. She did not know what Jock's and Shadow's intentions were when they said they wanted to go to Little Village.

¶ 15    Patton continued on cross-examination to testify that it took a few minutes to go from the house on Strawberry Lane to Little Village. She figured that they would go to Little Village first, because it was right by the Mobil where she was going anyway. She did not hear any discussions about guns during that time, nor did she see any guns. When they got to Little Village, "somebody" told defendant to stop the Navigator. Defendant did so, and Jock and Shadow got out and started to walk away. When defendant stopped, Patton did not see anybody outside on the streets. Jock and Shadow said something about meeting them around the back, and defendant started to drive away. Defendant drove away at a normal speed, and Patton heard gunshots very soon thereafter. Then the Navigator stopped, and Jock and Shadow got back in. Both Patton and defendant were looking around to see what was going on. Shadow was holding the same gun that she had seen before, but she did not see the gun's clip. Jock gave defendant driving directions, and defendant was "a little freaked out." Prior to getting into the Navigator, Patton did not hear any discussions about shooting or killing anybody.

¶ 16    On redirect examination, Patton testified that, when the four of them set off for Little Village that night, she knew that Jock and Shadow wanted "[t]o get at somebody." However, she did not think that Jock and Shadow were going to kill somebody. She would not have stayed in the car if she "thought it was going to be something serious."

¶ 17    On recross-examination, Patton agreed with defense counsel that "to get at somebody" could "also mean you're going to get at them by going and talking to them." Patton reiterated that she did not think that Jock and Shadow intended to kill somebody. Defense counsel asked: "To get at somebody could mean you got to [*sic*] talk to them about something other—just something. Getting at them is talking to them; is that fair?" Patton responded in the affirmative.

¶ 18    Upon further redirect examination, Patton acknowledged having told detectives on the night of the shooting: "yeah, like get at them, and they said one of these b*** if they are outside." She had also told police: "pretty much a Mexican," or words to that effect.

¶ 19    Defendant did not present any evidence. The jury found defendant guilty of murder and mob action but not guilty of attempted murder. He was sentenced to a total of 37 years in prison.

¶ 20                                    B. Direct Appeal

¶ 21    We affirmed defendant's convictions on direct appeal. We held that "[t]he evidence was sufficient to support defendant's convictions under a common-design theory" of legal accountability. *Garcia*, 2019 IL App (2d) 161112, ¶ 28. Among the facts that we cited in support of our holding were: (1) "defendant, Perez, Figueroa, and Patton belonged to a gang that was a rival of the gang to which Galicia, Casas, and Estrada belonged," (2) "defendant drove Perez and Figueroa to rival gang territory on the night of the shooting," (3) Casas and Estrada saw defendant's Navigator "drive slowly down Lake Shore Drive before the shooting and then leave the area once the two perpetrators jumped back into the vehicle," (4) "defendant fled with Perez and Figueroa after the shooting" by "driving recklessly through two counties" and then "jumped out of the Navigator with the other occupants of the vehicle," (5) defendant lied to police officers about not knowing Patton or at least "declined to reveal her name," and (6) police officers "found the murder weapon on the driver's seat of the Navigator," along with "masks in the back of the vehicle." *Garcia*, 2019 IL App (2d) 161112, ¶¶ 29-30.

¶ 22    We further noted that the jury "could have reasonably inferred that defendant was present when Perez was showing off his weapon hours before the shooting," as Patton testified both that she saw the weapon and that defendant was with her most of the night. *Garcia*, 2019 IL App (2d) 161112, ¶ 31. We also reasoned that the evidence supported that defendant heard either Perez or

Figueroa make a comment about wanting to go to Little Village to "go get at somebody." We noted that Patton testified that the "go-get-at-somebody" comment was made in defendant's presence, and defendant "indeed drove Perez and Figueroa to Little Village at their request." *Garcia*, 2019 IL App (2d) 161112, ¶ 32.

¶ 23   As to Patton's testimony that she did not know that Perez and Figueroa were going to do anything "serious" once they got to Little Village, we explained that "[t]he jury could have reasonably determined that Patton was minimizing her own involvement" in the shooting while also attempting to "protect defendant, who was her ex-boyfriend." *Garcia*, 2019 IL App (2d) 161112, ¶ 33. We also determined that, in considering what it meant to "go get at somebody," it was "important to consider the context in which the statement was made." *Garcia*, 2019 IL App (2d) 161112, ¶ 34. We said: "Where one gang member gave another gang member, who had been taking pictures with a gun earlier in the evening, a ride to rival gang territory for the stated purpose of 'get[ting] at somebody,' the jury could have reasonably found that this was an agreement or plan to engage in acts of violence or even murder." *Garcia*, 2019 IL App (2d) 161112, ¶ 34. Importantly, however, "even if defendant did not specifically contemplate murder, once he agreed to drive Perez and Figueroa to Little Village to facilitate their violent criminal activities, he became liable for their acts in furtherance of that common criminal design." *Garcia*, 2019 IL App (2d) 161112, ¶ 34.

¶ 24   We distinguished the case law that defendant cited. We determined that, unlike those cases, "the totality of the evidence here supported a conclusion that, before or during the commission of the offenses of murder and mob action by Perez and Figueroa, defendant intentionally promoted or facilitated those offenses by aiding and abetting his fellow gang members." *Garcia*, 2019 IL App (2d) 161112, ¶ 35.

¶ 25 The second argument that defendant raised on direct appeal was that the prosecutor used improper examples in closing argument to illustrate principles of legal accountability. Although we deemed those examples "inartful," we held that defendant was not entitled to relief pursuant to the plain-error doctrine. *Garcia*, 2019 IL App (2d) 161112, ¶ 45. We said that "[t]he evidence on the issue of defendant's accountability was not closely balanced." *Garcia*, 2019 IL App (2d) 161112, ¶ 46. On that point, we asserted: "the evidence overwhelmingly supported a conclusion that, before or during the commission of the offenses of murder and mob action and with the intent to promote or facilitate the commission of those offenses, defendant aided and abetted Perez and Figueroa by agreeing to be their 'wheelman.' " *Garcia*, 2019 IL App (2d) 161112, ¶ 46. Defendant likewise failed to demonstrate second-prong plain error, because "[t]he shortcomings in the prosecutor's examples were not so serious as to meet" the relevant standard. *Garcia*, 2019 IL App (2d) 161112, ¶ 47.

¶ 26                    C. Postconviction Petition

¶ 27 On October 13, 2020, defendant, *pro se*, filed a postconviction petition alleging actual innocence. He relied on Figueroa's affidavit. In this affidavit, Figueroa attested:

> "[O]n or about the night of November 30th, 2013, Ricardo Garcia was completely and unequivocally unaware of any plan to go out and shoot and/or kill anybody that night. I can also attest to the fact that Garcia was unaware of any firearms in his vehicle. As far as he was concerned, he was giving me a ride to the gas station to buy alcohol and cigarettes. Furthermore[,] I admit to placing the firearm on the driver's seat of the truck when we all got out of the vehicle and ran from the police. This is the absolute truth[,] and I would willingly testify to this in a court of law."

¶ 28 On November 19, 2020, the trial court summarily dismissed defendant's postconviction

petition. Although the court determined that Figueroa's affidavit was newly discovered evidence, the court found that defendant failed to meet the other required elements to allege an arguable claim of actual innocence. We granted defendant's motion for leave to file a late notice of appeal from this order.

¶ 29                                    II. ANALYSIS

¶ 30    The parties dispute whether defendant's postconviction petition warranted further proceedings.

¶ 31    The Post-Conviction Hearing Act provides a method whereby a person imprisoned in the penitentiary may assert that his or her conviction was the result of a substantial denial of his or her constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2020). "A claim of actual innocence is cognizable in a postconviction petition because the imprisonment of an innocent person violates the due process clause of the Illinois Constitution, as do procedural barriers to having a claim of innocence adjudicated on the merits." *People v. Henderson*, 2014 IL App (2d) 121219, ¶ 24.

¶ 32    A claim of actual innocence requires evidence that is "(1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47. "Newly discovered" means that the evidence was discovered after trial and the petitioner could not have discovered it earlier through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47. "Material" means that the evidence is "relevant and probative of the petitioner's innocence." *Robinson*, 2020 IL 123849, ¶ 47. "Noncumulative" means that the evidence "adds to the information that the fact finder heard at trial." *Robinson*, 2020 IL 123849, ¶ 47. The "conclusive character" requirement is "the most important element of an actual innocence claim"; it means that the new evidence, "when considered along with the trial evidence, would probably lead to a different result." *Robinson*,

2020 IL 123849, ¶ 47. In other words, "[t]he new evidence need not be entirely dispositive," but it must "place[ ] the trial evidence in a different light and undermine[ ] the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48.

¶ 33　　Here, the trial court summarily dismissed defendant's petition at the first stage of the proceedings. At the first stage, the trial court independently reviews the petition, taking the allegations as true (*People v. Tate*, 2012 IL 112214, ¶ 9), to determine whether the petition is "frivolous or *** patently without merit" (725 ILCS 5/122-2.1(a)(2) (West 2020)). The court may summarily dismiss a petition as frivolous or patently without merit only if it has "no arguable basis either in law or in fact." *Tate*, 2012 IL 112214, ¶ 9. Although the petition must "clearly set forth the respects in which petitioner's constitutional rights were violated" (725 ILCS 5/122-2 (West 2020)), the threshold for surviving the first stage is low (*People v. Hodges*, 234 Ill. 2d 1, 9 (2009)). The defendant must set forth only the gist of a constitutional claim, which means that the petition contains "enough facts to make out a claim that is arguably constitutional." *Hodges*, 234 Ill. 2d at 9. We review *de novo* an order summarily dismissing a postconviction petition. *Hodges*, 234 Ill. 2d at 9.

¶ 34　　"Generally, a codefendant's affidavit will be considered newly discovered evidence where the codefendant was not available to testify at the defendant's trial because to do so would have forced the codefendant to waive his privilege against self-incrimination." *People v. Ruhl*, 2021 IL App (2d) 200402, ¶ 86. The case at bar presents a twist on that familiar rule. The State called Figueroa as a witness at defendant's trial and offered him use immunity, but Figueroa refused to testify. In reviewing defendant's postconviction petition, the trial court determined that Figueroa's affidavit was newly discovered evidence because Figueroa "was a co-defendant and he refused to testify at trial (even with use immunity)," so "his testimony would have been unavailable at trial."

The court cited *Henderson*, but in that case the prosecution declined to offer a defense witness use immunity. *Henderson*, 2014 IL App (2d) 121219, ¶ 8. On appeal, the parties do not devote much attention to the newly-discovered-evidence requirement. For purposes of this appeal, we need not comment further on the issue. We will assume, without deciding, that Figueroa's affidavit constituted newly discovered evidence.

¶ 35    We determine that Figueroa's affidavit was not cumulative. In his affidavit, Figueroa claimed that he placed a firearm on the driver's seat of defendant's vehicle. That evidence was not presented at defendant's trial, so this fact would add to the information that the jury heard.

¶ 36    However, as we will explain, Figueroa's affidavit was not material, as he did not provide any factual allegations that were relevant and probative of defendant's innocence. For the same reason, Figueroa's affidavit did not satisfy the conclusive-character requirement by placing the trial evidence in a different light or undermining our confidence in defendant's guilt. Even at the first stage of postconviction proceedings, a defendant must provide at least some factual support for his or her claims. See *Hodges*, 234 Ill. 2d at 10 ("However, our recognition of a low threshold at this stage does not mean that a *pro se* petitioner is excused from providing any factual detail at all surrounding the alleged constitutional violation.").

¶ 37    In the first two sentences of his affidavit, Figueroa offered conclusions about defendant's state of mind without providing *any* supporting facts. Specifically, Figueroa attested: "[O]n or about the night of November 30th, 2013, Ricardo Garcia was completely and unequivocally unaware of any plan to go out and shoot and/or kill anybody that night. I can also attest to the fact that Garcia was unaware of any firearms in his vehicle." In our decision in defendant's direct appeal, we detailed the evidence supporting defendant's guilt under a common-design theory of accountability. For example, Patton testified that Perez showed off the murder weapon at the party

that defendant attended. Patton also testified that either Perez or Figueroa said something in defendant's presence about wanting to go to rival gang territory to "go get at somebody." Defendant then dropped off his associates in rival gang territory and remained in the general area. After the shooting, police officers witnessed defendant attempting to escape with his associates by driving recklessly into Rockford and then fleeing on foot. In his affidavit, Figueroa did not allege facts contradicting any of the State's evidence bearing on the group's common design.

¶ 38    Even taking as true the conclusory propositions in the first two sentences of Figueroa's affidavit, those propositions would not exonerate defendant. In his appellate brief, defendant asserts that Figueroa attested that defendant did not know that Figueroa and Perez were armed or that "they intended anything criminal." Elsewhere in his brief, defendant maintains that "Figueroa was essentially stating that he did not discuss his (or Perez's) mindset *at all* prior to arriving at the scene." (Emphasis in original.) However, that is not what Figueroa stated in his affidavit. Rather, Figueroa claimed only that defendant was "unaware of any firearms in his vehicle" and "unaware of any plan to go out and shoot and/or kill anybody that night." We note that conspicuously absent from Figueroa's affidavit was any allegation that defendant was unaware that Figueroa and Perez possessed masks. Moreover, as we explained in defendant's direct appeal, "even if defendant did not specifically contemplate murder, once he agreed to drive Perez and Figueroa to Little Village to facilitate their violent criminal activities, he became liable for their acts in furtherance of that common criminal design." *Garcia*, 2019 IL App (2d) 161112, ¶ 34.

¶ 39    In the third sentence of his affidavit, Figueroa asserted: "[a]s far as [defendant] was concerned, he was giving me a ride to the gas station to buy alcohol and cigarettes." Again, Figueroa provided no facts supporting his claim to knowledge about defendant's state of mind. Moreover, the record positively rebuts Figueroa's assertion that defendant thought that he was

merely taking Figueroa to a gas station, so Figueroa's statement had no arguable basis in fact. See *Robinson*, 2020 IL 123849, ¶ 60 ("For evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible ***."). The trial evidence showed that defendant dropped Figueroa and Perez off near apartments in rival gang territory— not at a gas station. Figueroa did not explain in his affidavit why his group ended up at an apartment complex if the driver of their vehicle thought that they were going to a gas station.

¶ 40    In the last substantive sentence of his affidavit, Figueroa "admit[s] to placing the firearm on the driver's seat of the truck when we all got out of the vehicle and ran from the police." This was the only claim in Figueroa's affidavit that was factual in nature rather than an unsupported conclusion about defendant's state of mind. Assuming the truth of this fact, it is not material, nor is it arguable that such fact would probably change the result on retrial. The State theorized that defendant was the getaway driver, not the shooter. Even if defendant never touched a firearm on the night of the shooting, he could still be found guilty of murder and mob action under accountability principles.

¶ 41    Defendant analogizes this case to *People v. Parker*, 2012 IL App (1st) 101809, and *People v. Lofton*, 2011 IL App (1st) 100118. Both of those cases involved affidavits attesting that the respective defendants were not present at the scene of the crimes. See *Parker*, 2012 IL App (1st) 101809, ¶ 64; *Lofton*, 2011 IL App (1st) 100118, ¶¶ 21-23. Here, by contrast, Figueroa did not deny that defendant drove him and Perez to and from the scene of the shooting. *Parker* is further distinguishable because the State's proof against the defendant in that case was relatively weak, consisting primarily of a confession that the defendant provided under questionable circumstances.

*Parker*, 2012 IL App (1st) 101809, ¶ 85. Here, we said in defendant's direct appeal that the evidence against defendant was overwhelming. *Garcia*, 2019 IL App (2d) 161112, ¶ 46.

¶ 42    Accordingly, we hold that defendant failed to allege an arguable claim of actual innocence, and his petition was frivolous and patently without merit. Accordingly, the trial court properly summarily dismissed defendant's petition.

¶ 43                                 III. CONCLUSION

¶ 44    For the reasons stated, we affirm the judgment of the circuit court of Boone County.

¶ 45    Affirmed.