2025 IL App (1st) 230583-U
No. 1-23-0583

FIRST DIVISION
June 16, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 95 CR 28516 |
| MELVIN HAMMOND, | ) | The Honorable Geraldine D'Souza, |
| Defendant-Appellant | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1       Held: (1) Defendant failed to make a substantial showing that appellate counsel provided ineffective assistance of counsel. (2) Postconviction counsel provided reasonable assistance.

¶ 2       Defendant Melvin Hammond appeals the second-stage dismissal of his postconviction petition. On appeal, defendant first argues that he made a substantial showing that appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness during closing arguments. Specifically, he contends that trial counsel was ineffective during closing argument

by (1) discrediting defendant's trial testimony and (2) conceding his guilt under a theory of accountability. He further asserts that trial counsel was ineffective for failing to object to the State's closing arguments when the State (1) implied that the jurors' oaths required them to convict defendant, (2) appealed to the jurors' emotions, and (3) misstated the law of accountability.

¶ 3         Additionally, defendant argues that postconviction counsel provided unreasonable assistance by (1) failing to obtain supporting evidence, (2) failing to overcome procedural forfeiture, and (3) failing to allege prejudice. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5         A grand jury indicted defendant on six counts of first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 1994)), one count of aggravated battery of a child (*id*. § 12-4.3(a)), three counts of aggravated battery (*id*. § 12-4(a)), and one count of endangering the life or health of a child (*id* § 12-21.6), for the death of thirteen-month-old Diamond Shaw. The matter proceeded to a jury trial.

¶ 6                                 A. Pre-Trial Proceedings

¶ 7         Trial counsel filed a motion in limine to qualify Kim L. Reilly as a defense expert witness to rebut the anticipated testimony of Dr. Kim,[1] the medical examiner who conducted Diamond's autopsy and was expected to testify that Diamond had sustained a skull fracture. Reilly, a physical anthropologist, would testify that the lines on Diamond's skull were not a fracture, but normal suture lines commonly found on all infants' skulls. Prior to trial, trial counsel informed the court that the motion in limine was no longer relevant. Trial counsel explained that the State no longer intended to call Dr. Kim as a witness. Instead, the State planned to call the medical

---

[1] The record does not contain Dr. Kim's first name.

examiner, Dr. Nancy Jones, as an expert. Dr. Jones stated that Dr. Kim was "partially mistaken" in concluding that Diamond had a skull fracture, noting that the lines identified were suture lines. The record does not reflect that the circuit court ever ruled on the defendant's motion in limine to qualify Reilly and she was not called as a witness.

¶ 8        Trial counsel also requested an involuntary manslaughter instruction. He argued that defendant's written statement provided enough evidence for the instruction and stated:

> "Now, our position is that through the jury selection process as well as through the evidence we put on, both through cross-examining the State's witness and our own, there is [a] theory of defense that will emerge. I think we would be hindered from pushing forth on that theory if we are not able to obtain a ruling from the Court, which would give us sort of a front line ruling that in fact our theory of the defense is one that we can actively put on."

The circuit court ruled that it would issue an involuntary manslaughter instruction if the evidence developed as trial counsel anticipated.

¶ 9                              B. Jury Selection and Opening Statement

¶ 10        During jury selection, Lieak—who ultimately served on the jury—informed the court that she worked as the manager of safety and security at a hospital. She regularly employed off-duty police officers from surrounding area police departments. She knew Officer Richard Barber. She affirmed that she would be able to judge his testimony in the same manner as any other witness. The circuit court asked, "Is there anything about this type of case that would prevent you from being fair and impartial?" Lieak responded, "I have seen abused children come through the emergency room." The circuit court then asked whether that exposure would prevent her from being fair and impartial. She responded, "No." The court then asked, "So even with your prior work experience, you still could be fair and impartial in this case?" She replied, "Yes, I could."

¶ 11        In his opening statement, trial counsel argued:

"The evidence in this case will show at most that Melvin Hammond did not prevent Michele Tate from injuring this child or that perhaps Melvin Hammond spanked this child at a time when she should not have been spanked. Under our law, that could be recklessness, and Judge Morrissey will instruct you on the law at the end of the case as he's told you this afternoon.

Consider the instructions that you receive a way of putting the evidence that you will hear over the next couple of days into a box, and the boxes that we have in this case are first degree murder box, and involuntary manslaughter box which is reckless conduct and not guilty."

¶ 12                                C. Trial Evidence

¶ 13                                1. *State's Case*

¶ 14        Burnham Police Chief J.D. Crull testified that, at approximately 8:59 a.m. on September 20, 1995, he responded to a dispatch call regarding a baby who was not breathing at 14401 Bensley Avenue, Apartment 3, in Burnham, Illinois. Crull arrived at the apartment approximately one minute after receiving the dispatch call, where defendant and Tate informed him that Diamond was unresponsive. Crull proceeded to the bedroom, where he found Diamond unresponsive and performed infant CPR on her. Paramedics arrived and transported Diamond to St. Margaret's Hospital in Lake County, Indiana. Crull then drove Tate to the hospital. During the drive, Tate stated that she had last seen Diamond with her eyes open at approximately 8:00 a.m. An hour later, Diamond was unresponsive, prompting Tate to call the police. Diamond was pronounced dead at the hospital.

¶ 15        Crull observed that Diamond had extensive bruising, with black and blue marks spanning from her waist to her knees and under her chest. She also had visible injuries on her face and legs. Additionally, Crull noticed that Diamond's vagina was swollen and bloody. He directed Officer Richard Barber to bring the department's photographic equipment to the hospital. Crull and Barber then met with the Lake County Coroner's Office and photographed Diamond's

injuries. Barber requested that Tate and defendant come to the police station to discuss the cause of Diamond's death.

¶ 16    Dr. Prakash Rattan testified that on September 20, 1995, he examined and treated Diamond in the emergency room. Dr. Rattan performed CPR, intubated her, and administered epinephrine. Diamond was pronounced dead at approximately 9:21 a.m. Dr. Rattan testified that Diamond's injuries were consistent with being struck by a blunt instrument.

¶ 17    Dr. Nancy Jones testified that she was the medical examiner who reviewed the autopsy of Diamond, which had been conducted by Dr. Kim. The autopsy revealed multiple blunt force trauma injuries of varying ages and types, distributed across nearly the entire surface of Diamond's body. Notably, her head exhibited two recent bruises on the right side of her forehead, a laceration near her right ear, healing injuries to the right cheek and lower jaw, and additional bruising on the left side of her head, including the left temporal region and a large bruise near the left ear, as well as a laceration on the left ear. Injuries to her wrists were indicative of her having been restrained.

¶ 18    Diamond's internal examination showed no evidence of natural disease or congenital abnormalities. Bruising on her back corresponded with deep subcutaneous hemorrhaging. Her head sustained significant internal injuries, including seven distinct areas of subgaleal hemorrhage—bleeding beneath the scalp surface—consistent with blunt trauma applied to multiple areas of the head. Examination of her brain revealed an epidural hemorrhage in the occipital region, located at the back of the head, which is bleeding between the skull and the outer layer of the dura mater. The brain itself was extremely swollen, and its surface displayed contusions and bruising.

¶ 19        Although Diamond's skull was largely intact, Dr. Jones identified a diastatic fracture. She explained that unlike adult skulls, children's skulls are not fully fused and contain sutures where bone growth occurs. As the brain swells and pressure increases inside the skull, these sutures may separate, resulting in diastatic fractures. In Diamond's case, accessory sutures at the base of her skull had separated due to swelling, producing additional diastatic fractures in that area. Dr. Jones opined that the injuries to Diamond's head were consistent with an adult repeatedly striking her with their hands. Over time, these injuries would cause the brain to swell, eventually leading to suture separation, compression of the brainstem, loss of respiratory and cardiac function, a coma-like state, and ultimately death. Dr. Jones concluded that Diamond's cause of death was multiple injuries resulting from blunt force trauma. Dr. Jones testified that, in layman's terms, Diamond had been beaten to death. Dr. Jones opined that the head injuries occurred between one and twelve hours before Diamond's death, but stated that, if required to be more specific, she would estimate they occurred within six hours prior to death.

¶ 20        On cross-examination, Dr. Jones acknowledged that she did not agree with all aspects of Dr. Kim's autopsy findings. Specifically, she disagreed with the conclusion that Diamond had sustained a skull fracture; in her view, the injury was a diastatic fracture.

¶ 21        Officer Richard Barber testified that on September 20, 1995, at approximately 9:20 a.m., he received a call from Crull. Following the call, he gathered camera equipment and waited to be picked up by Crull. Crull transported him to the hospital to take photographs of Diamond. He observed injuries to Diamond's body. Afterwards, he asked defendant and Tate to accompany him to the police station for questioning. Tate signed a consent form to allow the police to search her and defendant's apartment. He recovered a baby's car seat, an aqua wash cloth, a white sock with a red stain, a cardboard portion of a hanger, a black belt, two bed sheets, and three

shoelaces, one or two of which had red stains. The parties stipulated that Diamond's blood was on the sock and belt, and a mixture of her blood and defendant's blood was on the shoestrings and car seat cover. Diamond's car seat was located in the living room on a mountain of clothes.

¶ 22　　After he searched the apartment, Barber returned to the police station to question Tate and defendant. He read defendant his Miranda rights prior to questioning him. Defendant told Barber that approximately five months ago, he allowed Tate and Diamond to move in with him. Defendant was not the father of Diamond. He and Tate would occasionally discipline Diamond. Defendant would "whoop" or "spank" Diamond, and Tate would hit her with a belt. Defendant was six foot two inches and weighed one hundred seventy-five pounds. Defendant would tie Diamond's hands to the car seat where she slept.

¶ 23　　After reviewing the autopsy and interviewing neighbors, Barber again requested Tate's consent to search the apartment, which she provided. He did not notice a playpen, crib, or any baby toys in the apartment.

¶ 24　　Assistant State's Attorney John Coyne testified that he interviewed defendant on September 21, 1995. Prior to the interview, Coyne advised defendant of his Miranda rights. Coyne prepared a written statement, which defendant reviewed and signed. In the statement, defendant indicated that he had lived with Tate and Diamond since April 1995 and had assumed a parental role in Diamond's life. Defendant stated that he and Tate initially agreed that Tate would be the one to discipline Diamond by striking her on the legs, arms, and buttocks, which they considered a "good way to discipline" her. They subsequently agreed that both would "whup" Diamond.

¶ 25　　Defendant initially told Coyne to include in the statement that, beginning in mid-May, he disciplined Diamond by "whupping" her approximately ten times per month. Defendant asked

Coyne to reduce that estimate to eight times per month. Defendant stated he would discipline Diamond for crying, removing her diaper, and jumping off the bed. He explained that each time he disciplined her, he removed her diaper and struck her on the buttocks and legs for approximately three minutes. Defendant instructed Coyne to revise the statement to omit any reference to striking her legs.

¶ 26 Defendant further stated that beginning in July 1995, Tate began striking Diamond on the legs and buttocks with a belt, which caused multiple cuts. He estimated that Tate did this two to three times per week. Defendant acknowledged that Coyne showed him a photograph of Diamond that depicted cuts on her legs and buttocks. Defendant stated that he and Tate discussed using the belt on Diamond. When Tate said that her hands "did not work anymore," defendant told her, "my hand works," and continued using his hands to discipline Diamond while Tate used the belt. Defendant admitted that when he struck Diamond, he hit existing wounds, causing them to bleed. Defendant also acknowledged that Coyne showed him a photograph of injuries to Diamond's vaginal area and admitted to striking her there.

¶ 27 Defendant stated that on September 20, 1995, he arrived home at approximately 1:30 a.m. and found Diamond in her car seat, where she typically slept. When Diamond began to cry, he assumed she was thirsty because her bottle was broken. Tate was in bed, but defendant was unable to sleep due to the baby's crying. He told Diamond to "go to sleep" several times; she would calm down temporarily but then resume crying. Tate also told her to go to sleep. Defendant eventually got out of bed, removed Diamond's diaper, and "whupped" her before placing her back in the car seat. He believed she may have hit her head on the back of the seat. He returned to bed, but Diamond continued to cry and mumble. At Tate's suggestion, he placed the car seat with Diamond inside in the living room.

¶ 28   Defendant again returned to bed but remained unable to sleep. Tate then stated she was going to "whup" the baby. They both went into the living room. Defendant removed Diamond from the car seat and placed her on the floor, where she "hit her head." He then removed her diaper and struck her again. Afterward, he returned to bed and went to sleep. When he awoke at approximately 8:15 a.m., he noticed that something was wrong with the baby. Tate called 911.

¶ 29   Coyne also presented a photograph of injuries to Diamond's hands, and defendant admitted that he had previously tied her hands while she was in her car seat to prevent her from scratching her face. Following Coyne's testimony, the State rested.

¶ 30                            2. *Defendant's Case*

¶ 31   Latisha Murphy testified that she had a ten-year-old son with defendant. She admitted to having a prior felony for public benefits fraud. She had known defendant for sixteen years, beginning in elementary school. Their romantic relationship continued until approximately three years after high school. Defendant continued to visit weekly to see their son. Murphy testified that defendant had a reputation in the community for being a peaceful individual and a good caregiver.

¶ 32   Quaintance Motley testified that she had known defendant for approximately ten years. She described their relationship as that of boyfriend and girlfriend. She generally socialized with defendant four to five times per week. Motley testified that defendant had a reputation in the community for being a peaceful individual and a good caregiver.

¶ 33   Carolyn Hall testified that she was defendant's aunt. She stated that defendant's mother had suffered from cerebral palsy for approximately seven to eight years, and that defendant visited her home each night to care for her. Hall further testified that prior to moving in with

defendant, Tate had lived with defendant's cousin. Hall stated that defendant had a reputation in the community for being a peaceful person and a good caretaker.

¶ 34     Isaac Bracey testified that he had been a friend of defendant's for approximately seven years. He and defendant worked together as mechanics. Bracey stated that defendant cared for his mother, who had cerebral palsy, every night. On September 19, 1995, defendant left work at approximately 5:00 or 6:00 p.m. to care for his mother. Bracey testified that defendant had a reputation in the community for being a peaceful person and a good caretaker. He acknowledged a prior felony conviction for which he successfully completed probation.

¶ 35     Mark Hall testified that he was defendant's brother. He stated that in 1995, their mother required special care due to frequent seizures. Defendant provided that care by feeding her and keeping her company. Hall testified that he called their mother's house between approximately 12:00 and 1:00 a.m., and defendant answered the phone. Hall further testified that defendant had a reputation in the community for being a peaceful person and a good caretaker.

¶ 36     Yolanda Redman testified that she lived with defendant for a period of time while she was attending high school. She testified that defendant had a reputation in the community for being a peaceful person and a good caretaker.

¶ 37     Defendant testified that in early June of 1995, Tate and Diamond began living with him. When she moved in, Tate brought only some clothes and a car seat. The arrangement was intended to be temporary. Defendant and Tate discussed the arrangement beforehand and agreed that Diamond would remain Tate's responsibility, as defendant would be away working most of the day. He already had significant responsibilities caring for his mother and transporting her to the hospital.

¶ 38     At some point, defendant became aware that Tate was abusing Diamond. He heard what he described as a "whipping" sound coming from the bedroom. When he entered, he saw Tate spanking Diamond with a belt. He asked Tate, "What are you doing?," and she stopped. Tate promised she would not do it again. Two to three weeks later, he again witnessed Tate spanking Diamond with a belt. He told Tate to leave his apartment and dropped her and Diamond off at a friend's house. When he returned home that evening, Tate, her sister, her friend, and Diamond were outside his apartment. He allowed Tate and Diamond to stay at the apartment again.

¶ 39     Afterward, he continued to observe abuse marks on Diamond, specifically "whip marks" on her legs. He also noticed that Tate would sometimes leave Diamond alone in the bathtub. Eventually, he again told Tate and Diamond to leave, after observing "whip marks" on Diamond's arm. He drove them to Tate's friend's house. He did not recall where he went after dropping them off but stated that he did not return home immediately. When he eventually arrived at his apartment, Tate and Diamond were in the hallway of his building. He allowed them back in because he cared about Diamond. He described Tate as an angry, neglectful mother. He did not call the police or child protection services because Tate, her friends, and her sister reassured him that the abuse would not continue.

¶ 40     On September 19, 1995, defendant went to work in the morning and left around five in the evening. He went to his cousin's house and spent time with his son for about two to three hours. He then went to his mother's house to care for her. At approximately one in the morning on September 20, 1995, he received a phone call from his brother. He left his mother's house about twenty minutes later and went to a friend's house, where he stayed for approximately two hours. He returned home at around three in the morning.

¶ 41    Defendant testified that he normally gave Tate and Diamond the bedroom and slept in the front room. That night, he heard a small cry coming from the bedroom. In the bedroom, Tate was sitting on the bed and Diamond was in her car seat. Defendant stated that this was unusual because Diamond did not normally sleep in the car seat at night. He removed her from the car seat and placed her in the bed. When Tate objected, he returned Diamond to the car seat. He initially went to the front room to sleep, but Tate convinced him to sleep in the bed. Diamond continued to whine, and defendant asked Tate, "What's wrong with her?" Tate responded that nothing was wrong with Diamond. He thought Tate might not have fed Diamond, as she often failed to do so. Tate told him to put Diamond in the front room, and he did.

¶ 42    He admitted that at some point that night, he spanked Diamond. She continued to fuss in the other room, which agitated Tate. Tate said, "I'm going to go in there, she better be quiet." They both went into the front room. Defendant removed Diamond from the chair and placed her on the carpeted floor. He then spanked her on her butt a little and put her back in the car seat. He and Tate then went to sleep in the bedroom. He later awoke to Tate returning to the bedroom and heard Diamond awake in the front room. He remembered Tate saying, "I'm going to go whip Diamond," at some point during the evening. He went back to sleep and woke up around eight o'clock. Diamond was still in her car seat, and he believed she was awake because her eyes appeared open. He then told Tate to call 911. He picked up Diamond and carried her to the bed. He listened for a heartbeat and attempted to perform mouth-to-mouth resuscitation.

¶ 43    The police arrived and attempted to revive Diamond. Defendant went to the hospital, where Diamond was pronounced dead. He then went to the police station to speak with the police. He testified that he did not spank Diamond that evening to discipline her but rather to soothe her. He clarified that he told Coyne it was a possibility that she hit her head on the car

seat and the carpeted floor. He testified that they tied socks onto Diamond's hands to prevent her from scratching her face. He stated that he did not intend to kill Diamond and that he did not commit any act that created a strong probability of death or great bodily harm. He stated that he did not do anything other than spank Diamond on the butt.

¶ 44   On cross-examination, defendant denied the statements in his written statement and testified that "his mind was not there" when he made them. He did not distinguish between the words "spank," "whup," and "whip." He also did not recall making some of the statements attributed to him in the written statement. He admitted that he did not see Tate hit Diamond on September 20, 1995. He admitted that he never told Barber that he saw Tate hitting Diamond, but he thought he told Coyne. Defendant testified that he did not have an opportunity to read the written statement and that Coyne did not read it to him. He denied making corrections to the statement. When he told Coyne that he spanked Diamond, he meant a soft little pat. He agreed that the injuries caused to Diamond could not have been caused by a soft little pat. He further denied tying Diamond to the car seat and denied ever seeing blood on the car seat or the contusions and bruises on Diamond's head. He also denied seeing the bruises on her back and the cuts on her buttocks. He denied giving Diamond those injuries. He testified that he only softly spanked her on her buttocks and demonstrated a soft patting motion to the court. On redirect examination, he admitted that he signed the written statement but stated that he did not review it. He clarified that his demonstration to the court reflected how he had spanked Diamond throughout mid-May.

¶ 45   The parties stipulated that on December 9, 1994, Diamond was admitted to the hospital for a near drowning, pneumonia, and child neglect. Tate had left her unattended in a bathtub.

Tate claimed that she had left Diamond alone for one to two minutes, and upon her return, found Diamond face down in the water.

¶ 46        Following the stipulation, the defense rested.

¶ 47                                 D. Closing Arguments

¶ 48        Prior to the start of closing arguments, the circuit court instructed the jury, "At this time the lawyers have the opportunity of making final arguments to you. What the lawyers say is not evidence and should not be considered evidence. *** After you have heard arguments, I will instruct you on the law***." The State then argued in closing:

> The evidence is in, and we have an opportunity to make our final arguments to you. I would like to thank you on behalf of the People of the State of Illinois for undertaking this solemn, serious task. You swore when you took your oath that you would follow the law and that you would follow the facts, and we're trusting you that you will do that.
>
> You know Diamond Shaw didn't have much of an opportunity in this. Her life was sort of life, well, that's good enough for her, and we believe that if you follow your oath, that if you promise—if you do what you promised to do, that Diamond Shaw will get justice today, that she will get more than that's good enough.
>
>                         ***
>
> "All over this world on September 20, 1995, parents put their babies down to bed, and in order to chase away the boogie man and the monsters that lurk under the bed, they sing them lullabies, they read them fairy tales, and they whisper sweet dreams. On September 20, Diamond Shaw didn't get a fairy tale. Her life was a horror story, and on September 20, Diamond Shaw didn't have any wishes for sweet dreams. That night was a nightmare come true, and on September 20, the boogieman wasn't chased away, and the monsters wasn't vanished from underneath the bed. Melvin Hammond may be a prince of a man among his family and friends, but to Diamond Shaw, he was a monster. She was alone, she was helpless, she was hopeless. She's not alone anymore, and we're hopeful that you follow your oath, and if you follow your oath, you will find the defendant guilty of first degree murder because he murdered Diamond Shaw.
>
> Sweet dreams Diamond."

¶ 49        Trial counsel argued in closing:

"Let me say at the very outset that among the facts that you have to consider is the statements that Mr. Hammond gave sometime within a day and a half of his arrest when he spoke to Investigator Barber, State's Attorney Brian Holmes, and State's Attorney John Coyne. You will get the written statement that was given to John Coyne. We are telling you candidly that is the facts of those events that you should consider. Ask yourself what's more accurate? Something that you have said three times shortly after an occurrence or something that you testify to almost four years after an event when you've had all that time to think about Lord knows what?

\*\*\*

Doctor Jones also talked about how the injuries that led to her death occurred [some time] between one to 12 hours before. The end of her cross-examination she admitted, agreed that there was the possibility of up to 12 hours before, and then ask yourself who was home 12 hours before. Was it Michelle Tate? Or was it Melvin Hammond?

\*\*\*

The choice should be between knowledge of strong probability of great bodily harm and recklessness of involuntary manslaughter, and with respect to involuntary manslaughter, you will be given three instructions on that. One is the definition of involuntary manslaughter; two is the issues involved in involuntary manslaughter; and three is the definition of recklessness. Recklessness alone will be defined for you in the instructions. Intent and knowledge will not be, but recklessness you will have before you, and Melvin, let me say to you, you should have done something to stop her death. You failed to take that step, and that was recklessness, and he shouldn't have spanked her that night. That was recklessness, and that's involuntary manslaughter, and that's the verdict you should return."

¶ 50    The State argued in rebuttal:

"This case is not about involuntary manslaughter. This case isn't about an accident. It's not about an intended act. It's about an isolated incident. It's about a monster that comes into the night and steals our kids. It's about a guy six foot two, 175 pounds, had no qualms about beating the hell out of that baby.

This is not about bottles and not about boxes. You have heard counsel in opening statements tell you put things in their little boxes. Ladies and gentlemen, you now know the law, the law of responsibility. Anything that pertains to Michelle Tate, anything the pertains to Melvin Hammond gets put in one box together. They're responsible, the law of responsibility, the law of accountability, if you believe the garbage he told you today, if you believe that garbage that she had her hands on that belt, the law of responsibility puts this guys on that belt as well. They're both responsible.

\*\*\*

The defense now wants you to believe his statement, and the reason they want you to believe his statement to police is because he got on the witness stand, and he got caught lying. They want you to believe his statement, but disregard the things that he got up there and lied. Remember that when you get that statement back there, read that statement, and you will see that never, never did he tell a police official or a State's Attorney or in his own confession even say that Michelle beat the child that last day. They want you to disregard what he said on the stand, but they want you to overlook what he said in his statement. Do not do that.

\*\*\*

Ladies and gentlemen, this is a night of ritual in bedrooms across our country. Each night children go to bed including babies, and they're scared, and they wait for their parents to reassure them and they crawl under the covers, and they're afraid of the monsters and they're afraid of the boogie man, and each night parents, like ourselves, go in there, you hug the kid, kiss the kid, tuck them into the covers, then you reassure them, you're going to see that Diamond Shaw died with her eyes open, and you're going to see her eyes, saw the boogie man come that night, just like other nights, the monsters came, and her eyes were open, and the last person she saw coming to her was this guy armed with a belt, the boogie man, the monster six, two, 175. She heard those awful footsteps coming, and she cried out because the monsters were coming again. Doctor Jones told you that some of those injuries were so old, so you know that even that little child knew what was about to [happen]. When that child cried out, she cried out for mom who didn't care. She cried out for father who wasn't there. Michelle Tate just stayed in bed. That little child cried, she cried out, her eyes are open, and she saw, she's strapped down, she's tied down, and she saw the boogie man come one final time. The final picture you will see of Diamond Shaw, are restful position almost like she's asleep, her hands folded almost as if she's praying, and each night is a prayer we all say with our kids, Now I lay me down to sleep, I pray the Lord my soul to keep, and if I die before I wake, if I die before I wake—She now rests in that coffin. The monster's been caught. Don't let that monster go. He's guilty of murder."

¶ 51                                    E. Jury Instruction

¶ 52          The circuit court then instructed the jury:

The law that applies to this case is stated in these instructions, and it is your duty to follow all of them. You must not single out certain instructions and disregard others.

It is your duty to determine the facts, and to determine them only from the evidence in this case. You are to apply the law to the facts and in this way decide the case.

Neither sympathy nor prejudice should influence you.

***

The evidence which you should consider consists only of the testimony of the witnesses and the exhibits which the court has received.

Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, and interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case.

You should judge the testimony of the defendant in the same manner as you judge the testimony of any other witness.

*** Neither opening statements nor closing arguments are evidence, and any statements or arguments made by the attorneys which are not based on the evidence should be disregarded."

With respect to the issues in this case, the jury received Illinois Pattern Jury Instructions Nos. 1.02 (jury is the sole judge of the believability of witnesses), 1.03 (arguments of counsel), 2.01I (first degree murder and involuntary manslaughter) 3.11 (prior inconsistent statements), 5.01 (recklessness), 5.03 (accountability), and 7.07 (definition of involuntary manslaughter). See Illinois Pattern Jury Instructions, Criminal, Nos. 1.02, 1.03, 2.01I, 3.11, 5.01, 5.03, and 7.07 (3d ed. Supp. 1996) (hereinafter IPI Criminal 3d (Supp. 1996)).

¶ 53                                   E. Verdict and Sentencing

¶ 54        The jury found defendant guilty of first degree murder. The circuit court determined that defendant was eligible for the death penalty based on Diamond's age and the presence of exceptionally brutal and heinous conduct, but concluded that mitigating evidence weighed against imposing the death penalty. The court sentenced him to a mandatory life sentence. On appeal, this Court affirmed defendant's conviction but vacated his sentence and remanded for resentencing because his sentence violated the single subject clause. *People v. Hammond*, No. 1-99-3337 (2001) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 55    At resentencing, the circuit court sentenced defendant to 75 years' imprisonment, again referencing Diamond's age and the brutal and heinous nature of defendant's conduct. Defendant appealed, arguing his sentence was grossly disproportionate to Tate's 25-year sentence resulting from her guilty plea following trial, but before the jury reached a verdict. This Court affirmed defendant's sentence. *People v. Hammond*, No. 1-1-03-0823 (2006) (unpublished order under Illinois Supreme Court Rule 23).

¶ 56                    F. Postconviction Proceedings

¶ 57    On July 20, 2007, defendant filed a *pro se* postconviction petition, asserting that appellate counsel was ineffective for failing to argue that trial counsel provided ineffective assistance by telling the jury to believe defendant's written statement over his trial testimony. The circuit court advanced the petition to the second stage and appointed counsel. Postconviction counsel filed an Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) certificate and a motion to withdraw. The motion to withdraw failed to address defendant's claim that trial counsel was ineffective for not calling a medical expert to testify regarding the timing of Diamond's fatal injuries. The circuit court granted postconviction counsel's motion to withdraw. On January 15, 2010, defendant filed a supplemental petition. The State filed a motion to dismiss both petitions. The circuit court granted the State's motion to dismiss, and defendant appealed.

¶ 58    On appeal, this Court determined that postconviction counsel's failure to address defendant's ineffective assistance claim regarding the medical expert demonstrated that she failed to ascertain his claims. *People v. Hammond*, 2012 IL App (1st) 101096-U, ¶ 25. This Court held that postconviction counsel failed to comply with Rule 651(c) and remanded for further second-stage proceedings. *Id.* ¶ 28.

¶ 59    On August 8, 2013, defendant filed an amended *pro se* petition again alleging that appellate counsel was ineffective for failing to raise trial counsel's error in urging the jury to credit his written statement over his testimony. He also asserted that appellate counsel should have challenged trial counsel's failure to object to the State's closing argument, which invoked the passions of the jurors and misstated the law of accountability.

¶ 60    Postconviction counsel filed a Rule 651(c) certificate, which stated that she would proceed on defendant's *pro se* petitions. The State filed a motion to dismiss. On April 22, 2022, defendant filed a supplemental postconviction petition. A new postconviction counsel was appointed. Postconviction counsel filed an amended petition incorporating the *pro se* petitions by reference. The amended petition also included both claims regarding trial counsel's closing argument and the State's closing argument. Additionally, postconviction counsel filed verification affidavits from defendant and a 651(c) certificate, which affirmed that he consulted with defendant, examined the record, and prepared an amended petition that adequately set forth defendant's claims. The State filed a motion to dismiss and postconviction counsel stood on the amended petition. The circuit court granted the State's motion to dismiss, and defendant appealed.

¶ 61                                II. ANALYSIS

¶ 62    On appeal, defendant raises numerous issues stemming from the dismissal of his postconviction petition. Defendant first argues that he made a substantial showing that appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness during closing arguments. Specifically, he contends that trial counsel was ineffective during closing argument by (1) discrediting defendant's trial testimony and (2) conceding his guilt under a theory of accountability. He further asserts that trial counsel was ineffective for failing to object to the

State's closing arguments when the State (1) implied that the jurors' oaths required them to convict defendant, (2) appealed to the jurors' emotions, and (3) misstated the law of accountability.

¶ 63    Defendant next argues that postconviction counsel provided unreasonable assistance by (1) failing to obtain supporting evidence, (2) failing to overcome procedural forfeiture, and (3) failing to allege prejudice. We address each of these eight issues in detail below.

¶ 64        A. Ineffective Assistance of Appellate Counsel for Failing to Allege Trial Counsel's

Ineffectiveness

¶ 65    On appeal, defendant contends that he made a substantial showing of ineffective assistance of appellate counsel for failing to argue that trial counsel was ineffective both for making certain comments during closing argument and for failing to object to the State's closing argument.

¶ 66    The Post-Conviction Hearing Act ("Act") (725 ILCS 5/122-1 et seq. (West 2006)) establishes a three-stage process for criminal defendants to challenge their convictions based on substantial violations of their constitutional rights. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). At the first stage, the circuit court may dismiss the petition if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2007). If the petition advances to the second stage, the court may appoint counsel for an indigent defendant, and the State may file a motion to dismiss or answer. *Id*. § 122-4, 122-5. At this stage, the circuit court must determine whether the petition and supporting documents make a substantial showing of a constitutional violation. *People v. Domagala*, 2013 IL 113688, ¶ 33. This stage tests the legal sufficiency of the petition. *Id*. ¶ 35. The petitioner's factual allegations are taken as true unless affirmatively refuted by the record. *Id*. The question is whether those allegations, if proven at an evidentiary hearing, would establish

a constitutional violation and entitle the petitioner to relief. *Id*. We review *de novo* the circuit court's dismissal of a second-stage petition. *People v. Pendleton*, 223 Ill. 2d 458, 473.

¶ 67 To prevail on a claim of ineffective assistance of counsel, "a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' ". *Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Failure to satisfy either prong precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 35. This same standard applies to claims of ineffective assistance of appellate counsel. *People v. Caldwell*, 2023 IL App (1st) 221586, ¶ 18. A defendant raising such a claim must show that appellate counsel's performance was deficient and that, but for that deficiency, there is a reasonable probability the appeal would have succeeded. *Id*. "Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Simms*, 192 Ill. 2d 348, 362 (2000). Thus, the prejudice inquiry requires the reviewing court to assess the merits of the underlying issue, because a defendant is not prejudiced by appellate counsel's failure to raise a claim that lacks merit. *Id*. Claims of ineffective assistance of counsel must be evaluated under the totality of the circumstances specific to each individual case. *People v. Shatner*, 174 Ill. 2d 133, 147 (1996).

¶ 68 1. *Trial Counsel's Alleged Ineffectiveness in Closing*

¶ 69 Defendant contends that trial counsel was ineffective during closing argument by (1) discrediting defendant's trial testimony and (2) conceding his guilt under a theory of accountability.

¶ 70      Judicial review of counsel's performance is highly deferential, and there is a strong presumption that counsel's conduct falls within the broad range of reasonable professional assistance. *People v. Manning*, 241 Ill. 2d 319, 334 (2011). The burden is on the defendant to overcome the presumption that the challenged conduct could be considered sound trial strategy under the circumstances. *Id*. Reviewing courts should be reluctant to second-guess strategic decisions, even if they appear questionable in hindsight. *Id*.

¶ 71      Counsel is afforded wide latitude in closing argument. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 158. "Counsel's decision to argue a particular defense theory during closing argument is a matter of trial strategy." *People v. Milton*, 354 Ill. App. 3d 283, 289 (1st Dist. 2004). To establish ineffective assistance based on comments made during closing argument, the defendant must overcome the strong presumption that counsel was competent and that the remarks were part of a reasonable trial strategy. *People v. Davis*, 356 Ill. App. 3d 725, 730 (1st Dist. 2005). A reviewing court assesses the reasonableness of counsel's conduct from counsel's perspective considering the totality of the circumstances in the case. *Milton*, 354 Ill. App. 3d at 289. Even when counsel concedes guilt, prejudice is not presumed unless the strategy constitutes a complete failure to subject the prosecution's case to meaningful adversarial testing. *Id*. at 290.

¶ 72      At the outset, we note that trial counsel subjected the State's case to meaningful adversarial testing. Trial counsel put forth a theory of defense—involuntary manslaughter as opposed to first degree murder—cross-examined the State's witnesses, presented witnesses to testify regarding defendant's reputation for peacefulness and as a good caretaker, and successfully moved the court to instruct the jury on the lesser offense of involuntary manslaughter. Involuntary manslaughter requires a less culpable mental state, recklessness,

whereas first degree murder requires an intentional mental state. *People v. Robinson*, 232 Ill. 2d 98, 105 (2008).

¶ 73                    a. Discrediting Defendant's Trial Testimony

¶ 74       Defendant contends that trial counsel was ineffective during closing argument by discrediting defendant's trial testimony.

¶ 75       To establish ineffective assistance based on comments made during closing argument, the defendant must overcome the strong presumption that counsel was competent and that the remarks were part of a reasonable trial strategy. *People v. Davis*, 356 Ill. App. 3d 725, 730 (1st Dist. 2005). A reviewing court assesses the reasonableness of counsel's conduct from counsel's perspective considering the totality of the circumstances in the case. *Milton*, 354 Ill. App. 3d at 289.

¶ 76       Trial counsel's strategy throughout the proceedings was reasonable and grounded in the circumstances presented at trial. Defendant attempted to downplay his involvement in Diamond's death by offering testimony that sought to minimize his culpability. However, this testimony was directly contradicted by his prior written statement to police and by the medical evidence, creating a clear inconsistency that undermined his credibility. A review of the trial transcripts indicates that trial counsel made a strategic decision to urge the jury to disregard defendant's testimony because it was, at best, inconsistent and, at worst, wholly incredible. Given the weakness of defendant's testimony, it was reasonable for counsel to attempt to mitigate its damaging effect by distancing the defense from it entirely. Defendant's argument is internally inconsistent: he claims trial counsel was ineffective for instructing the jury to disregard his testimony, yet it was defendant's own erratic and conflicting statements which undermined an otherwise sound strategy of pursuing a lesser offense of involuntary manslaughter. In fact, in

his *pro se* petition, defendant stated "The defendant now understands partly that his trial counsel was trying to seek a conviction for a lesser offense\*\*\*."

¶ 77    In this context, trial counsel's decision to direct the jury to disregard defendant's testimony during closing argument was reasonable. This strategy allowed the jury to consider a less culpable mental state, such as recklessness, in support of an involuntary manslaughter conviction. Maintaining this strategy, even considering defendant's testimony, was not unreasonable. Given the evidence presented at trial, pursuing a verdict of involuntary manslaughter was a sound defense strategy, as a not guilty verdict was not a reasonable probability. *People v. Little*, 2021 IL App (1st) 181984, ¶ 52 (generally, counsel's choice of which defense theory to pursue is a matter of trial strategy).

¶ 78                                   b. Accountability

¶ 79    Additionally, defendant contends that trial counsel's comments reprimanding him in front of the jury constituted a concession of guilt based on accountability. "A person is legally accountable for the conduct of another when either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 1994). "However, mere presence at the scene of a crime and knowledge that a crime is being committed are insufficient to establish accountability." *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 33. Trial counsel's comments during closing, that defendant should have intervened to prevent Diamond's death, did not concede defendant's accountability for murder. Rather, trial counsel argued defendant's failure to intervene despite knowledge of ongoing abuse was reckless, as was defendant's act of spanking Diamond given the abuse she allegedly suffered previously at Tate's hands. Contrary to defendant's assertion, trial

counsel's remarks, viewed in context and based on the totality of the circumstances, aligned with the defense theory of involuntary manslaughter. Accordingly, trial counsel's comments represented a reasonable trial strategy rather than a concession of guilt based on accountability.

¶ 80                    c. Defendant Cannot Show Prejudice Resulted From Closing Argument

¶ 81          Assuming, *arguendo*, that trial counsel's remarks during closing constituted deficient performance, defendant would still be required to demonstrate prejudice resulting from counsel's remarks. *Simpson*, 2015 IL 116512, ¶ 35. Defendant has failed to show a reasonable probability that, absent counsel's remarks during closing argument, the outcome of the trial would have been different. Given all the evidence of defendant's guilt, including his prior written statement to police, the medical evidence, the fact that the jury heard and considered his testimony, and the trial court's instruction that opening and closing arguments are not evidence, we cannot conclude that, but for counsel's allegedly deficient performance, there is a reasonable probability that the outcome of the trial would have been different.

¶ 82          2. Trial Counsel's Alleged Ineffectiveness for Failing to Object to State's Closing
Argument

¶ 83          Defendant argues that trial counsel was ineffective for failing to object to the State's closing argument when the State (1) implied that the jurors' oaths required them to convict defendant, (2) appealed to the jurors' emotions, and (3) misstated the law of accountability.

¶ 84          Decisions concerning what to object to and when to object are matters of trial strategy and are therefore entitled to substantial deference. *People v. Bell*, 2021 IL App (1st) 190366, ¶ 73. "Prosecutors are afforded wide latitude in closing argument." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). During closing argument, the prosecutor may comment on the evidence and suggest any fair and reasonable inferences it supports, even if those inferences portray the

defendant in a negative light. *People v. Perry*, 224 Ill. 2d 312, 347 (2007). Reviewing courts assess the closing argument in its entirety, rather than isolating specific phrases or comments. *Id.* A reviewing court will find reversible error only if the defendant shows that the improper remarks were so prejudicial that they denied a fair trial or caused the verdict to be based on the error. *People v. Jackson*, 2020 IL 124112, ¶ 83. "The showing of *Strickland* prejudice in this context is similar to the prejudice that establishes reversible error for improper prosecutorial remarks: whether the guilty verdict resulted from trial counsel's failure to object." *Id.* ¶ 91.

¶ 85                                                        a. Improper Remarks

¶ 86         At the outset, we agree with defendant that the State's comments implying that the jurors would violate their oaths if they failed to convict defendant were improper. See *People v. Nelson*, 193 Ill. 2d 216, 227 (2000). The State's references to him as a "monster" and the "boogie man" in the context of Diamond's final prayer also appear to have been improper. While references to defendant as a "monster" may have been supported by the evidence (See *People v. Burton*, 338 Ill. App. 3d 406, 419-20 (1st Dist. 2003)), the reference to him as the "boogie man" in the context of bedtime rituals and prayers only served the purpose to inflame the emotions of the jurors which is improper (See *People v. Wheeler*, 226 Ill. 2d 92, 128 (2007). However, our agreement with defendant on this issue ends there. As explained more fully below, any impropriety in the State's remarks constituted harmless error because the remarks did not influence the verdict.

¶ 87         The State's remarks about the law of accountability appeared less as an effort to illustrate the law (see *People v. Garcia*, 2019 IL App (2d) 161112, ¶ 37), and more as a statement that both defendant and Tate were responsible for Diamond's death. Accordingly, given their context, the State's comments on accountability were not improper.

¶ 88        b.  Defendant Cannot Show Prejudice Resulted from Counsel's Failure to Object

¶ 89        Still, our finding that some of the State's remarks were improper does not end the analysis. Defendant must still demonstrate that his guilty verdict resulted from trial counsel's failure to object to those improper comments. Put another way, he must show that the State's remarks constituted a material factor in his conviction.

¶ 90        Even assuming, *arguendo*, that all the State's remarks were improper, the ultimate issue with defendant's argument is that he cannot establish prejudice from the State's remarks. Defendant needed to establish that "the improper remarks constituted a material factor in defendant's conviction." *Wheeler*, 226 Ill. 2d at 123. The improper remarks were located in approximately seven paragraphs of the State's closing argument which encompassed approximately twenty one pages of trial transcripts. See *People v. Runge*, 234 Ill. 2d 68, 143 (2009) (we consider the brevity of the comments in relation to the overall length of the closing arguments when assessing their prejudicial impact). The circuit court also instructed the jury on what to properly consider before and after the closing arguments See *Jackson*, 2020 IL 124112, ¶ 87 (we also consider that the trial court instructed the jury to disregard any closing argument statements not based on the evidence). Additionally, the jury received instructions on the law of accountability, and "[i]mproper arguments can be corrected by proper jury instructions, which carry more weight that the arguments of counsel." *People v. Green*, 2017 IL App (1st) 152513.

¶ 91        Given all the evidence of defendant's guilt, including his prior written statement to police, the medical evidence, the trial court's instruction that opening and closing arguments are not evidence, the jury's instructions on the law of accountability, and the brevity of the State's remarks in the context of its entire closing argument, we cannot conclude that the State's remarks had a material effect on the jury's verdict.

¶ 92        3. Defendant Cannot Show That Appellate Counsel Was Ineffective in Failing to Raise
the Foregoing Meritless Claims Regarding Trial Counsel's Ineffectiveness

¶ 93        We conclude this analysis by reiterating the framework under which defendant raises all these issues, which is that appellate counsel was ineffective for failing to raise them on direct appeal. To prevail on such a claim, a defendant must show that appellate counsel's performance was deficient and that, but for that deficiency, there is a reasonable probability the appeal would have succeeded. *People v. Caldwell*, 2023 IL App (1st) 221586, ¶ 18. "Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Simms*, 192 Ill. 2d 348, 362 (2000). Based on our analysis above, appellate counsel's appraisal of the merits of defendant's claims was not patently wrong, and appellate counsel was therefore not deficient for failing to raise them. Likewise, there is no reasonable probability that these issues would have been successful on appeal.

¶ 94        B. Unreasonable Assistance of Postconviction Counsel

¶ 95        Defendant argues that postconviction counsel provided unreasonable assistance by (1) failing to obtain supporting evidence, (2) failing to overcome procedural forfeiture, and (3) failing to allege prejudice. We address each issue in detail below.

¶ 96        The right to counsel in postconviction proceedings is derived from statute. *People v. Flores*, 153 Ill. 2d 264, 276 (1992); see 725 ILCS 5/122-4 (West 2018). Accordingly, postconviction petitioners are guaranteed only the level of assistance provided for by the Act, which our supreme court has determined to be a reasonable level of assistance. *People v. Turner*, 187 Ill. 2d 406, 410 (1999). Under the lower reasonable assistance standard required in

postconviction proceedings, Illinois Supreme Court Rule 651 (eff. July 1, 2017) significantly limits what postconviction counsel is required to do. *People v. Custer*, 2019 IL 123339, ¶ 32. To ensure that postconviction petitioners receive reasonable assistance, Rule 651(c) requires postconviction counsel to perform the following duties:

> "The record filed in that court shall contain a showing, which may be made by the certificate of petitioner's attorney, that the attorney has consulted with petitioner by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

Substantial compliance with the rule is mandatory. *People v. Addison*, 2023 IL 127119, ¶ 21.

¶ 97    The filing of a Rule 651(c) certificate creates a rebuttable presumption that counsel provided reasonable assistance. *Id*. Rule 651(c) only requires postconviction counsel to certify that they completed the specific, limited tasks outlined in the rule. *Custer*, 2019 IL 123339, ¶ 38. Counsel is not required to strengthen every claim in the petitioner's *pro se* postconviction petition, regardless of its legal merit, or to present every witness or piece of evidence the petitioner believes might support their case. *Id*. A court may reasonably presume that postconviction counsel made a good faith effort to obtain evidence supporting the postconviction claims but was unable to do so. *People v. Wallace*, 2016 IL App (1st) 142758, ¶ 27. Defendant bears the burden of overcoming this presumption by demonstrating his attorney's failure to substantially comply with the duties mandated by the rule. *Addison*, 2023 IL 127119, ¶ 21.

¶ 98                    1. *Failure to Attach Supporting Evidence*

¶ 99    Defendant alleges that postconviction counsel should have included an affidavit from Reilly, an affidavit from an expert regarding the timing of Diamond's death, an affidavit from Dr. Kim, letters written to defendant from Tate, Crull's police report, the court's file of jury

selections or trial counsel's records, an affidavit from trial counsel or the prosecutors, or an affidavit from defendant.

¶ 100     Again, the reviewing court may reasonably presume that postconviction counsel made a good faith effort to obtain evidence supporting the postconviction claims but was unable to do so. *Wallace*, 2016 IL App (1st) 142758, ¶ 27. Furthermore, counsel is not required to strengthen every claim in the petitioner's *pro se* postconviction petition, regardless of its legal merit, or to present every witness or piece of evidence the petitioner believes might support their case. *Custer*, 2019 IL 123339, ¶ 38. The failure to attach either defendant or trial counsel's affidavit does not constitute unreasonable assistance of postconviction counsel. *People v. Hunt*, 2023 IL App (2d) 220153, ¶ 28. Accordingly, we presume that postconviction counsel made a good faith effort to obtain this supporting evidence but was unable to do so.

¶ 101                    2. *Failure to Amend to Overcome Forfeiture*

¶ 102     Defendant argues that postconviction counsel provided unreasonable assistance by failing to overcome procedural forfeiture. He specifically argues that postconviction counsel failed to overcome forfeiture by not explicitly arguing that the appellate counsel was ineffective for failing to raise his claim that "the court erred and abused [its] discretion because it relied on the State's theory during sentencing rather than the evidence."

¶ 103     In making this argument, defendant claims that this claim is distinct from his claim that appellate counsel was ineffective for failing to argue that the sentencing court abused its discretion in finding his conduct brutal and heinous. However, this argument is clearly rebutted by an examination of defendant's 2010 *pro se* postconviction petition.

¶ 104     In his 2010 petition, defendant raises two separate claims, which are numbered (1) and (2). The first alleges that appellate counsel was ineffective for failing to argue that the sentencing

court abused its discretion in finding his conduct brutal and heinous. The second alleges that appellate counsel was ineffective for failing to argue that the circuit court erred in denying his motion for a directed verdict. Both claims are best characterized as rambling; the first spans seven pages, and the second spans eight.

¶ 105　　　Defendant now asserts that a distinct third claim appears within the body of the first. But the one sentence he now isolates as a separate claim is materially indistinguishable from other statements made in support of the first claim. For example, on the first page of that claim, he writes: "Defendant's [a]ppellate counsel could have [a]rgued the fact is the State failed to [p]resent any sufficient evidence during the [d]efendant's trial or sentencing hearing to prove beyond a reasonable doubt that the [d]efendant's conduct or [b]ehavior was indeed exceptionally [b]rutal and heinous indicative of wanton and cruelty [sic] as a matter of law." This sentence, like the one he now characterizes as an independent claim, simply reiterates his broader argument that the sentencing court abused its discretion in finding his conduct brutal and heinous. Furthermore, on the page following the sentence he now identifies as a distinct claim, he concludes this line of argument by asking the postconviction court to rely on the evidence in determining whether his conduct was brutal and heinous. Put simply, this was all one claim.

¶ 106　　　Accordingly, postconviction counsel provided reasonable assistance by arguing that appellate counsel was ineffective for failing to raise on direct appeal that the sentencing court erred by finding defendant's conduct brutal and heinous. In arguing ineffective assistance of appellate counsel, postconviction counsel also overcame forfeiture of that claim. Furthermore, postconviction counsel incorporated all of defendant's *pro se* petitions into the amended petition, and defendant had already overcome forfeiture by framing this issue as one of ineffective assistance of appellate counsel.

¶ 107                                    3. *Failure to Argue Prejudice*

¶ 108        Defendant argues that postconviction counsel provided unreasonable assistance by failing to allege prejudice.

¶ 109        In making this argument, defendant claims that *People v. Dixon*, 2018 IL App (3d) 150630, is analogous to this case. In *Dixon*, postconviction counsel filed an amended postconviction petition which contained conclusory allegations of ineffective assistance of counsel. *Dixon*, 2018 IL App (3d) 150630, ¶¶ 5, 17-18. The Third District determined that since the amended petition failed to allege specific facts to support its general claims, that the amended petition was not in proper legal form. *Id*. ¶ 20.

¶ 110        Here, postconviction counsel incorporated by reference defendant's four prior *pro se* petitions. In total, defendant's *pro se* petitions included approximately 104 pages of factual allegations supporting his claims. Defendant argues that this is insufficient. He asserts that because some of his claims did not explicitly use the word "prejudice," they failed to adequately allege an essential element of ineffective assistance of counsel. However, this argument overlooks the holding in *Dixon* and the applicable standard at second stage of postconviction proceedings. The *Dixon* court did not focus on the lack of a conclusory allegation of prejudice in its determination that postconviction counsel provided unreasonable assistance, rather, it focused on the failure of counsel to allege *any* specific facts in support of the claims. *Dixon*, 2018 IL App (3d) 150630, ¶ 21. This holding is consistent with the standard at second stage which asks whether the petition's factual allegations establish or show a constitutional violation. *Domagala*, 2013 IL 113688, ¶ 35.

¶ 111        Accordingly, postconviction counsel did not provide unreasonable assistance by incorporating defendant's factual allegations into the amended petition.

¶ 112                                          CONCLUSION

¶ 113         For the reasons stated above, we affirm the judgment of the Circuit Court of Cook

County.

¶ 114         Affirmed.